211 P.3d 812 (2009)
STATE of Kansas, Appellee,
v.
Michael D. HOUSTON, Sr., Appellant.
No. 98,373.
Supreme Court of Kansas.
July 17, 2009.
*815 Carl Folsom, III, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.
Edmond D. Brancart, deputy district attorney, argued the cause, and Cathy A. Eaton, assistant district attorney, and Steve Six, attorney general, and Jerome A. Gorman, *816 district attorney, were with him on the briefs for appellee.
The opinion of the court was delivered by NUSS, J.:
Michael D. Houston, Sr., was convicted of intentional second-degree murder for shooting Joshua Johnson and received a sentence of 165 months' imprisonment. He appealed, and the Court of Appeals affirmed. State v. Houston, No. 98,373, 2008 WL 4140640, unpublished opinion filed September 5, 2008. We granted Houston's petition for review under K.S.A. 60-2101(b).
Houston's issues on appeal, and our accompanying holdings, are as follows:
1. Did the trial court prevent Houston from fully presenting his theory of defense by refusing to admit certain evidence about Johnson's prior acts of violence against Houston's family? No.
2. Did the prosecutor commit reversible misconduct in eliciting testimony from Houston about his stay at Larned State Hospital? No.
3. Did the trial court commit reversible error in admitting testimony about Johnson's statement that Houston had a gun hours before the shooting occurred? No.
4. Did the trial court commit reversible error in refusing Houston's request to instruct the jury on the lesser included offense of involuntary manslaughter? No.
5. Did cumulative error deny Houston a fair trial? No.
6. Did the trial court violate Houston's Sixth and Fourteenth Amendment rights under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), when sentencing him to the aggravated sentence in the grid box without requiring that the aggravating factors be charged in the complaint, put before a jury, and proved beyond a reasonable doubt? No.
Accordingly, we affirm.

FACTS
The defendant, Michael D. Houston, Sr., lived on Delavan Avenue in Kansas City, Kansas, with his wife and children. Around 2000, Houston became friends with Joshua Johnson. Johnson did not live in the neighborhood, but his grandparents lived next door to Houston, and Johnson's mother lived across the street.
The friendship soured in 2001 when Johnson learned that Houston had a sexual relationship with Johnson's girlfriend, Natasha Tavai. One of Houston's sons also allegedly had sex with Tavai.
Johnson and Tavai continued to date, but the Houston and Johnson families became embroiled in an ongoing feud that involved threats and acts of violence by both sides. This feud lasted for more than a year and a half. During this time, Tavai gave birth to Johnson's son, and the three continued to visit his family members in Houston's neighborhood.
Both families filed complaints against the other, with some resulting in municipal court cases. Sherri Houston, Houston's wife, testified that there was always something going on between the two families, and that she kept a journal documenting the incidents. According to Sherri, on one occasion Johnson drove by and directed racial slurs at her family; her son ended up hurt the next day. She could not recall exactly when this incident occurred. Sherri also testified that she tried to get help from the police department, the Federal Bureau of Investigation, the United States Department of Justice, and the community police officer.
On March 24, 2003, the day of Johnson's death, Houston was driving three of his children home when a bottle flew across his windshield. He quickly turned and saw Johnson and Tavai going by in a minivan. There were no other cars nearby. Houston followed them to Leonard's auto body shop. When he arrived, he got out of his car, approached Johnson, and the two men got into a heated argument on the lot.
Houston claimed to have seen Johnson reaching into Tavai's minivan for a baseball bat during one point in the argument. After several bystanders gathered, the argument ended, and Houston drove away. Johnson *817 remained at Leonard's for about 2 hours waiting on his car to be repaired.
Linda Parker, Johnson's grandmother, testified that she and her husband, Donald, drove past Leonard's during the altercation. Linda and Donald both testified that there was a lot of yelling and cussing. According to Linda, Houston told Johnson, "[C]ome on, big boy, come on."
Houston's versions are mixed on exactly what he did after leaving Leonard's. According to his statement to the police the next day, he drove to a liquor store and purchased a 6-pack of beer. He then drove to his house, where the children got out. Houston told the police he went into the house and got his loaded shotgun out of his closet, got back into the car with the gun, and then called his son, Mike, Jr., to tell him about the argument. He then drove to Conoco to get more cigarettes.
At the later trial, however, Houston testified that he went to the liquor store and bought some liquor and a 6-pack of beer. According to his testimony, he went to his house where the children got out and he called 911; he was advised that police would not be dispatched. Houston then got his shotgun out of the closet, returned to his car, smoked the last of his cigarettes, and went to Conoco for more cigarettes.
Jeff Betts, who witnessed the earlier altercation from his auto shop next door to Leonard's, testified that Houston called him afterward. According to Betts, Houston told him about an ongoing feud with Johnson. Betts also testified that Houston told him that someone had hit one of his sons with a crowbar or pipe, and indicated  but did not say  it was Johnson.
Johnson's mother, Lora Walker, testified that Johnson called her from Leonard's about an hour before the shooting and told her to be careful because he thought Houston had a gun. Ashley Walker, Johnson's sister, testified that Johnson called her a little later and said that he was planning to come back to their house for a family dinner.
Ashley testified that sometime after the call she heard horns honking so she went to the front door. According to Ashley, her mother was already headed out the front door, and yelled for her son D.J. to bring the phone to her. When Ashley went outside, she saw Tavai's van parked behind Johnson's car in front of the house. She also saw Houston's car parked across the street. Ashley testified that she heard her mother screaming and saw Houston fire a "long gun" at Johnson. She believed that Houston was 6 or 7 feet away from Johnson's car when he pulled the trigger.
D.J. testified he heard horns honking in front of the house and followed his mother to see what was going on. When D.J. got to the porch, he saw Houston pointing a shotgun at Johnson. A few seconds later, he saw the blast of the gun and immediately ran to Johnson's car. He saw Houston get in his car and back down Delavan Street.
Houston testified that Johnson swung his car door open, forcing Houston to swerve his own car. Houston then stopped his car in the middle of the street. He testified that he got out and approached Johnson's car. According to him, by then Johnson was almost completely out of his car. Houston testified that he shot Johnson because Johnson was reaching behind him for a weapon.
"[PROSECUTOR]: ... What was he [Johnson] doing with his right hand?
"[HOUSTON]: Reaching just like I'm coming out now (indicating).
"[PROSECUTOR]: Okay. Could you tell what he was reaching for?
"[HOUSTON]: No, sir, I could not.
"[PROSECUTOR]: What did you think he was reaching for?
"[HOUSTON]: I didn't know.
"[PROSECUTOR]: Did you have some idea, though?
"[HOUSTON]: I knew it had to be a weapon of some type, but what type of weapon, no."
Police found no weapons in Johnson's car. However, after Houston told them that they would find a bat in Tavai's van, they recovered one there.
Houston turned himself in to the police the morning after the shooting. As mentioned, his statement to the police contained some *818 differences from his trial testimony, e.g., he did not claim that Johnson was almost completely out of his car. Rather, Houston only told them that Johnson was in his car trying to open the door when Houston fired. Indeed, because Johnson was 6' 2" and weighed over 400 pounds, his family members testified that he would have had a difficult time getting out of the car quickly. Also unlike Houston's trial testimony, he did not tell the police that he thought Johnson was reaching for a weapon.
Officer Dustin Sillings, who picked up Houston when he turned himself in, testified that Houston told him, "I said I'm tired of this shit, I got out of the car with my gun and I walked around and pulled the trigger." When the police asked Houston whether he saw Johnson with a weapon, he responded, "Not as far as, not like drawn on me or nothing like that, as far as I know." The officer then asked, "You didn't see any weapon?" Houston responded, "No."
Houston was charged with first-degree premeditated murder. A jury convicted him of the lesser included offense of second-degree intentional murder. The Court of Appeals reversed and remanded for a new trial in State v. Houston, No. 93,771, 2006 WL 851306, unpublished opinion filed March 31, 2006.
Upon remand, the State amended the complaint and charged Houston only with second-degree intentional murder. At the retrial, he contended that he shot Johnson in self-defense. After being instructed on second-degree intentional murder, voluntary manslaughter, and self-defense, the jury again convicted Houston of second-degree intentional murder.
Houston appealed and the Court of Appeals affirmed on all issues. More facts will be provided as necessary to the analysis.

ANALYSIS
As a threshold matter, we observe that the parties devoted their entire oral arguments before this court to discussing issue 4: whether Houston was entitled to a jury instruction on involuntary manslaughter. Consequently, their positions on the remaining five issues derive entirely from their appellate briefs and the petition for review.

Issue 1: The trial court did not prevent Houston from presenting his theory of defense.

Houston first argues that the trial court violated his right to present his theory of defense by excluding evidence of Johnson's prior acts of violence. Specifically, he claims that the trial court erroneously excluded evidence that on prior occasions Johnson: (1) hit Houston's son, Frank, with a crowbar; (2) hit Frank with a rock; (3) hit Houston's son, Michael, Jr., in the head with a brick; and (4) spun his tires at Houston's family and made racial slurs. Per Houston's petition for review, he claims this evidence was necessary to his theory of defense because it was relevant to establish his state of mind at the time of the shooting.
The State responds that the record is replete with numerous other acts of violence by Johnson, and Houston's thorough exploration of this behavior allowed him to present his self-defense theory.
Houston additionally argues that the Court of Appeals erroneously applied an abuse of discretion standard of review. He contends that whether evidence is relevant is a legal question that appellate courts review de novo.
We begin our analysis by noting that during a hearing on pretrial motions, extensive discussion occurred regarding Houston's written proffer purportedly including 20 items. Our analysis is hampered because that proffer is not contained in the record on appeal. Nevertheless, the hearing transcript reveals that the trial court recognized that evidence of Johnson's violent nature or acts toward Houston was relevant to Houston's self-defense theory. See State v. Walters, 284 Kan. 1, 14, 159 P.3d 174 (2007). However, the court found that some testimony, i.e., regarding acts committed by, or directed toward, Johnson's or Houston's family members, was not relevant.
"Switching over to defendant's proposed evidence, I think evidence showing the propensity of the deceased for violence *819 towards Mr. Houston I think is admissible as well, but I don't think evidence of  I think it has to be limited to that type of evidence. The fact that something was going on with the deceased and the defendant's children, ... I don't believe that that is probative to any issue in the case." (Emphasis added.)
The trial judge later observed in the hearing, "I think we need to limit ourselves here to the evidence that is clearly relevant to this issue `was this self defense or not?'." (Emphasis added.) The court then recited the specific testimony to which the State objected:
"Okay. Well, let's talk then  let's just start on number three, August 2001, defendant's children have rocks thrown and pepper spray directed at them by Joshua and his family.
"Number four, September 2001, Joshua hit Frank Houston with a crowbar. Donald Walker pulled a gun and pointed it at defendant's son. Joshua hit Frank Houston in the head with a rock.
....
"Number nine, Joshua spun truck tires at family and said he was going to get us niggers and the next day hit Michael Houston, Jr. in head with a brick.
"Those are on this proffer items number three through nine. [Defense counsel], it does not appear to me that those would be relevant to the issue of your client's  that would give your client reason to believe that Mr. Johnson was going for a gun and that he needed to kill him in self defense under the circumstances that this occurred." (Emphasis added.)
After argument from both sides, the court disallowed Houston's use of items three through nine of his proffer.
In rejecting Houston's argument, the Court of Appeals noted that much of his proffer of Johnson's acts about which he now argues should have been admitted into evidence was actually presented at trial. It stated:
"Jeff Betts testified that Houston called him after the incident at Leonard's. Betts testified that Houston told him about previous problems with Houston's daughter being hit and his son being hit with a crowbar. Betts testified that he assumed Johnson had committed these acts because that is who Betts and Houston were talking about. [Next,] Sherri Houston testified that Johnson drove by and directed racial slurs at her family and that her son ended up hurt the next day. It appears that the only specific evidence that was excluded was that Johnson hit Frank with a rock, and in a separate incident, Johnson hit Michael, Jr., in the head with a brick." Slip op. at 3.
The panel then determined that the trial court did not abuse its discretion in excluding evidence of these final two episodes because they were not "relevant to Houston's claim of self-defense." Slip Op. at 3. Specifically, the panel found the allegation that Johnson previously threw a rock or a brick at Houston's sons was not logically connected to Houston's belief that Johnson was reaching for a weapon in his car on the night of the shooting. Slip op. at 3.
Houston now argues that both lower courts denied his fundamental right to a fair trial because the erroneously excluded evidence was relevant to his theory of self-defense by tending to prove his state of mind at the time of the shooting.
We have held that a defendant is entitled to present his or her defense, and a defendant's fundamental right to a fair trial is violated if evidence that is an integral part of that theory is excluded. State v. Cooperwood, 282 Kan. 572, Syl. ¶ 1, 147 P.3d 125 (2006). However, that right is not unlimited. "[T]he right to present a defense is subject to statutory rules and case law interpretation of the rules of evidence and procedure." Walters, 284 Kan. 1, Syl. ¶ 1, 159 P.3d 174.
We also acknowledge that when a defendant raises a claim of self-defense, evidence of the victim's violent or turbulent character may be relevant to establish the defendant's state of mind. Walters, 284 Kan. at 10-11, 159 P.3d 174. However, to establish relevance, i.e., probativity, there must be some logical connection between the asserted facts and the inference or result they are *820 intended to establish. See State v. Reid, 286 Kan. 494, 502-03, 186 P.3d 713 (2008). In Reid, we explained that the definition of "relevance" as described in K.S.A. 60-401(b) ("`[R]elevant evidence' means evidence having any tendency in reason to prove any material fact."), like Federal Rule of Evidence 401, contains both a probative element and a materiality element. There we held that we review trial court determinations of the probativity prong of relevance for an abuse of discretion, and determinations of materiality are reviewed de novo. 286 Kan. at 508-09, 186 P.3d 713. We therefore expressly reject Houston's general assertion that relevance is reviewed de novo.
Houston relies upon Walters and State v. Mays, 254 Kan. 479, 866 P.2d 1037 (1994). Neither case, however, supports his argument. In Walters, the defendant was charged with and convicted of second-degree murder. He argued that the trial court erred in excluding evidence establishing his actions were in self-defense. This court explained that evidence tending to prove the defendant's state of mind prior to the shooting, i.e., that "he was induced to believe in good faith that he was in imminent danger of death or great bodily harm at the hands of the person killed," is admissible. 284 Kan. at 10, 159 P.3d 174 (quoting State v. Burton, 63 Kan. 602, Syl. ¶ 3, 66 P. 633 [1901]).
Walters sought to call a witness to testify about an incident approximately 1 year before the murder in which the victim told the witness that the victim was going to kill Walters and then commit suicide. This threat was relayed to Walters. The trial court excluded the evidence, finding it was irrelevant due to its remoteness. After observing that "`"[d]etermining whether evidence is too remote to be admissible rests within the sound discretion of the trial court,"'" 284 Kan. at 14, 159 P.3d 174, the Walters court noted that more recent incidents were testified to at trial. Consequently, the court concluded that the trial court did not err in excluding this evidence. 284 Kan. at 15, 159 P.3d 174.
As noted above, the incident involving Frank getting struck by a rock happened in 2001, but the fatal shooting occurred in 2003. Because this incident occurred 2 years before the shooting, per Walters it was well within the trial court's discretion to determine that the evidence failed to provide a logical connection to Houston's state of mind the day of the shooting.
In Mays, the defendant was charged with rape and aggravated robbery. He argued that the trial court denied him a fair trial by excluding evidence that supported his theory of defense. This court agreed because the excluded evidence was "key to and an integral part of the defendant's defense." 254 Kan. at 486, 866 P.2d 1037. The only evidence supporting the conviction was the victim's testimony; therefore, the excluded evidence bearing on the victim's credibility was key to Mays' defense. The Mays court noted that if the jury believed the victim's testimony, "it necessarily would convict the defendant." 254 Kan. at 486, 866 P.2d 1037.
By contrast, in addition to the testimony of Betts (Frank being struck by a crowbar) and Sherri Houston (Johnson's spinning tires and racial slurs) noted by the panel, Houston was able to present his own considerable testimony in support of his theory of self-defense. He testified extensively to his history with Johnson, including the following:
"[DEFENSE ATTORNEY]: ... At any point in the past had Joshua done anything with a baseball bat or had you heard or were you familiar with him doing something with a baseball bat?
"[HOUSTON]: He had never swung or hit at me or nothing like that with a baseball bat, but past experience, gentleman said every time they get into it with somebody, this is what weapon they would use.
"[DEFENSE ATTORNEY]: Okay. How about had Joshua ever said anything to you about having a gun or using a gun towards you?
"[HOUSTON]: There have been times that he have hollered, you niggers gonna make me get my gun and stuff like that.
....
"[DEFENSE ATTORNEY]: Was there any point when you were almost  almost struck by a car driven by Joshua?

*821 "[HOUSTON]: Yes, sir.... [A]fter he made his turn, he swove [sic] over and tried to hit me.... I jumped up against the fence out of the way from getting hit by the car.
"[DEFENSE ATTORNEY]: At any time had Joshua made threats to you?
"[HOUSTON]: Several times.
"[DEFENSE ATTORNEY]: And had you filed complaints with the police?
"[HOUSTON]: Yes, sir."
As for the remaining excluded evidence about which Houston complains  Johnson hitting Michael with a thrown brick on an unknown date  we agree that the trial court was within its discretion to exclude this as having no logical connection to Houston's belief that Johnson was reaching for a weapon in his car on the night of the shooting.
Finally, the panel noted that even if the trial court had erroneously excluded the relevant evidence, reversal would not be required. Slip op. at 4. See State v. Drayton, 285 Kan. 689, 702, 175 P.3d 861 (2008) (consistent with K.S.A. 60-261, errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done. Among other things, this court specifically considers whether the error is of such a nature as to affect the outcome of the trial.); Walters, 284 Kan. 1, Syl. ¶ 6, 159 P.3d 174 ("Before a federal constitutional error can be held harmless, the appellate court must be able to declare a belief that it was harmless beyond a reasonable doubt; stated another way, that the error had little, if any, likelihood of having changed the result of the trial.").
The panel observed that the jury heard Houston's testimony set forth above, testimony about the general animosity between the Houston family and the Johnson family, and the specific animosity between Houston and Johnson after Houston had sex with Tavai. The record on appeal readily supports the panel's observation. We independently observe the testimony of Betts and Sherri Houston and the testimony regarding the confrontation at Leonard's 1 hour before the shooting.
In short, we agree with the Court of Appeals that the trial record as a whole clearly established that Houston was able to adequately present his theory of defense.

Issue 2: The prosecutor did not commit reversible misconduct.

Houston next argues that the prosecutor committed reversible misconduct when he "willfully" elicited testimony from him that he had been to Larned State Hospital. He contends that the key issue in this case was his state of mind and that this testimony was highly prejudicial because it inferred that he was not "reasonable or ordinary." Houston further argues that the Court of Appeals erred in concluding that his statement was simply a nonresponsive answer and that the prosecutor's questions were permissible.
The State essentially responds that the prosecutor's primary question was proper and that Houston's answer was nonresponsive to a simple yes-or-no question.
Our standard of review of allegations of prosecutorial misconduct is well-known:
"Allegations of prosecutorial misconduct require a two-step analysis. First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal." State v. White, 284 Kan. 333, Syl. ¶ 1, 161 P.3d 208 (2007).
The same basic analytical framework applies to a defendant's claim that the prosecutor asked improper questions, except in such scenarios the defendant is required to have made a contemporaneous objection. State v. King, 288 Kan. 333, Syl. ¶¶ 5, 7, 204 P.3d 585 (2009). If the questions are impermissible, and contemporaneous objections made, the court must then determine whether the questions were so prejudicial as to require a new trial. State v. Hernandez, 284 *822 Kan. 74, 159 P.3d 950 (2007); State v. Swinney, 280 Kan. 768, 127 P.3d 261 (2006). We have provided specific guidance on how to make this determination:
"In the second step of the two-step prosecutorial misconduct analysis, the appellate court considers three factors to determine whether a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial), have been met." State v. Bryant, 285 Kan. 970, Syl. ¶ 2, 179 P.3d 1122 (2008).
During Houston's direct examination, the following exchange took place with his counsel:
"[DEFENSE COUNSEL]: And we've heard testimony actually from the State's witnesses as well that there was some kind of problems going on between the families, correct?
"[HOUSTON]: Yes, sir.
"[DEFENSE COUNSEL]: Okay. And what did that do to you over a period of time having that go on? What-how did that get into your mind?
"[HOUSTON]: It  to any parent, any individual that goes through situations as far as a child. I don't know if I can say. You say I can only say so much or maybe understand from what I'm saying 
"[DEFENSE COUNSEL]: Right now I'm asking you about generalities, the fact that this stuff went on over a period of time, how did that  what did that do to your mind?
"[HOUSTON]: It ate me up. It ate me up. It disturbed me. I couldn't sleep, the whole nine yards where I was more or less paranoid, you know. You try to sleep, you hear a noise, you always looking around, seeing if you gonna be approached from any angle. I mean, yes, it bothered me a whole lot."
During the State's resultant cross-examination of Houston, the following exchange occurred:
"[PROSECUTOR]: Okay. And this [thrown] bottle incident, was it  and you testified I think this was really no different than any other time you've had a dispute with Josh?
"[HOUSTON]: Any incident  anything that goes on is different because it's never the same.
"[PROSECUTOR]: Were you any more angry?
"[HOUSTON]: I mean I'm upset, don't get me wrong.
"[PROSECUTOR]: Right.
"[HOUSTON]: Confused, you know. Why would you 
"[PROSECUTOR]: And you're not trying to put your mental state in question here, are you? You're just saying you might have been angry, you might have wanted to protect?
"[HOUSTON]: Mental state, I say mental state like this, if you [are] looking at the history of things that happened to my family, yes, it would be a mental state.
"[PROSECUTOR]: But you've talked to somebody about your mental state, correct?
"[HOUSTON]: Larned State Hospital.
"[PROSECUTOR]: Right. And they didn't have any  they didn't confirm it?
"[HOUSTON]: But they felt their" 
Defense counsel then interrupted, asked to approach the bench, objected to the prosecutor's line of questioning, and moved for a mistrial. The prosecutor responded that Houston had put his state of mind at issue during direct examination.

*823 "[PROSECUTOR]: Judge, one of the questions that was directly asked of him on direct examination was what did that do to your mind, and he's sitting there trying to explain it. And I didn't bring... up there was a mental eval. I said you've talked to someone. I don't obviously have the chance to pretrial [interrogate] Mr. Houston to know he's going to blurt out that he went to Larned Mental Hospital. I was wanting to ask him, you've addressed that issue and that's not present today?
"[DEFENSE COUNSEL]: Well, Judge, the record should show that, in fact, my client was evaluated at Larned State Hospital. Mr. Bryant's been the prosecutor for the entire case so he well knows that he was evaluated there. And when he asked a question about did you talk to somebody, I think it's pretty obvious that he should know what the answer is going to be, it's going to be in reference to a mental hospital.
"[PROSECUTOR]: If he would have answered `yes' or `no,' it would have never come up.
"THE COURT: Well, the motion for a mistrial would be denied. I'm not sure that  I'm not sure the impact of that question and answer on the jury if that was made perfectly clear that he went to Larned that that, in fact, has a negative impact on how anybody would take a look at it, but that's not  that's not an issue the fact that he went there. So, Mr. Bryant, can you move on to something else?"
At the hearing on Houston's motion for new trial, the trial court concluded that the prosecutor did not specifically elicit the testimony about Larned State Hospital and did not commit misconduct.
The Court of Appeals first considered whether the prosecutor's questions were impermissible. It observed that prior to the first trial, Houston had filed a motion for a competency evaluation, and the court ordered an evaluation at Larned State Hospital. The trial court adopted the findings in the Larned report and found Houston competent to stand trial. The panel noted that Houston nevertheless testified about his state of mind resulting from the ongoing feud between his family and Johnson's family. Therefore, the panel noted that Houston arguably opened the door to the prosecutor's questions by placing his mental state at issue during his direct examination. Slip op. at 5.
The panel also found that Houston's statement that he had talked to someone about his mental state at the hospital was not responsive to the prosecutor's question, which called for a yes-or-no answer. It concluded that when placing the entire examination into context, the questions were not impermissible. It further held that even if impermissible, the questions did not constitute plain error.
Even assuming, without deciding, that the questions were impermissible, we generally agree with the panel. The prosecutor's line of questioning was not gross and flagrant but apparently responded to Houston's attempt to introduce evidence about his state of mind in the years before the shooting. Moreover, there is no evidence of prosecutorial ill will in the record. Finally, we agree that the purported misconduct was harmless under both K.S.A. 60-261 (inconsistent with substantial justice) and Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial). Like the panel, we observe that Houston admitted that he did not see Johnson holding any weapon when Houston shot him. We independently observe that Houston did not tell the police that he thought Johnson was even reaching for a weapon. We also independently observe that Houston told the police that Johnson was still in his car trying to open the door when Houston fired. This statement is consistent with the undisputed fact of Johnson's immense size and the testimony of his relatives that he would have had difficulty getting out of the car quickly.
As a result, we hold that Houston was not denied a fair trial because of prosecutorial misconduct. See White, 284 Kan. 333, Syl. ¶ 1, 161 P.3d 208.

*824 Issue 3: The trial court did not commit reversible error in admitting Johnson's statement that Houston had a gun before he arrived at the scene of the shooting.

Houston next argues that the trial court erred in admitting Lora Walker's testimony that her son, Johnson, had called her an hour before the shooting and told her to be careful, "that Mike had a gun." He further contends that the Court of Appeals erred in holding the issue had not been preserved for appeal because no contemporaneous objection had been made. The State generally responds that Houston is wrong on both bases.
Houston first contends that he sufficiently preserved this issue. He points out that he filed a motion in limine that sought to exclude from evidence: "Telephone call from Joshua Johnson to Lora Walker where she claims that he stated that defendant pulled a gun on him and threatened him at Leonard's auto shop." After hearing arguments on the motion the morning of trial, the judge asked the State whether Walker would be among its first witnesses. The State indicated that she might be called after the morning break. The judge replied:
"I want to think about that issue just a little bit longer, but I'll make a ruling certainly before  I'll make that ruling before she testifies and hopefully during the morning recess I can look up what I want to look up, but I'll make a ruling just as soon as I can."
Following the morning break, the judge ruled:
"Regarding the defendant's motion in limine about the defendant's conversation with his mother that said  where the mother said she had a telephone conversation with her son, the victim, said, `be careful, Mike has a gun.' The Court is going to let that testimony come in. Court would note that it's over the defendant's objection." (Emphasis added.)
Because Walker testified later that afternoon and because of the court's earlier observation that her testimony was "over the defendant's objection," Houston argues this shows a sufficient compliance with the contemporaneous objection rule.
We have held that when a pretrial motion to suppress has been denied, the moving party must still object to introduction of the evidence at trial in order to preserve the issue for appeal. State v. Jones, 267 Kan. 627, 637, 984 P.2d 132 (1999). The latter requirement is commonly known as the contemporaneous-objection rule and is codified in K.S.A. 60-404. See King, 288 Kan. 333, 204 P.3d 585. Specifically, the statute requires an on-the-record "objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." (Emphasis added.)
In Jones, the defendant argued that his counsel's action at the beginning of trial to renew his previous motions to suppress was the equivalent of a timely interposed objection to evidence when it was offered later during trial. The court rejected this argument, citing State v. Nunn, 244 Kan. 207, 768 P.2d 268 (1989), for "why nothing short of an objection at the time evidence is offered satisfied the requirement" of a contemporaneous objection. 267 Kan. at 637, 984 P.2d 132. The Court of Appeals has rejected a similar defense argument after denial of a pretrial motion to suppress, i.e., that an objection at the close of the State's evidence is contemporaneous. See State v. Daniels, 28 Kan. App.2d 364, 369, 17 P.3d 373 (2000), rev. denied 272 Kan. 1420 (2001). Because the objections were not contemporaneous, both the Jones and Daniels courts concluded that the evidentiary issue was not preserved for appeal.
Consistent with this case law, we hold that when a pretrial motion to suppress has been denied, the evidence must also be objected to at the time it is offered during the trial in order to preserve the issue for appeal. This holding is also consistent with the language in K.S.A. 60-404  objection to the evidence must be "timely interposed"  and consistent with this court's longstanding characterization of the statutory language as requiring a "contemporaneous" objection. Among other advantages, this holding allows a court to rule on the evidence before trial, but after hearing how the evidence unfolds *825 during trial, allows the court to be prepared  after timely trial objection  to reconsider its original ruling. Cf. Luce v. United States, 469 U.S. 38, 41-42, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (in limine ruling "is subject to change when the case unfolds.").
In our view, if the court's intent by the comment "it's over the defendant's objection" was unclear, Houston's counsel should have asked for clarification, e.g., "[W]ill an objection still be required at the time the testimony is offered during trial?" In the alternative, counsel should have asked for a continuing objection and thereby eliminated the need for the later trial objection. In State v. Parker, 277 Kan. 838, 845, 89 P.3d 622 (2004), the State allegedly violated an in limine ruling, but the court's granting a continuing defense objection preserved the issue on appeal for defendant:
"Where the trial court has granted counsel's request for continuing objection to evidence excluded by an order in limine, the trial court is in a position to avert error on account of the introduction of objectionable evidence. Thus, the rationale underlying the contemporaneous objection rule has been met, and the issue is preserved for appeal." 277 Kan. at 845, 89 P.3d 622.
We not only agree with the panel that Houston's evidentiary issue is not preserved for appeal, but even if it were, any error is also harmless. Houston argues this evidence suggests he was "looking for" Johnson to shoot. However, the panel correctly noted that the evidence was undisputed that Houston was armed with his shotgun on the evening of the shooting. The jury's hearing that Houston was first armed at the confrontation at Leonard's approximately 1 hour before the shooting, instead of when he admittedly returned home straight from there to retrieve his loaded shotgun and begin driving around town, had little, if any, impact on the particular offenses alleged (second-degree intentional murder and voluntary manslaughter based upon sudden quarrel or heat of passion) and the self-defense asserted. It can be equally argued that Johnson's knowledge that Houston had a gun at Leonard's actually increased the likelihood that Johnson later would have felt compelled to obtain a gun or other weapon  which Houston testified he "knew" Johnson was reaching for when Houston shot him.

Issue 4: The trial court did not err in refusing to instruct on the lesser included offense of involuntary manslaughter.

On retrial, the jury was instructed on the amended charge of second-degree intentional murder, as well as on voluntary manslaughter and self-defense. Houston argues that the trial court erroneously refused to instruct on involuntary manslaughter as a lesser included offense. Specifically, he asserts that the instruction was warranted because the jury could have found that he committed a lawful act of self-defense but in an unlawful manner because he used excessive force. See K.S.A. 21-3404(c) (Involuntary manslaughter is an unintentional killing "during the commission of a lawful act in an unlawful manner."). Houston cites State v. Gregory, 218 Kan. 180, 186, 542 P.2d 1051 (1975), for its holding that "use of excessive force could be found to be an `unlawful manner' of committing the lawful act of self-defense, and thus supply that requisite element of involuntary manslaughter."
In denying Houston's request, the trial court reasoned that Houston's position on self-defense would be covered by the instruction on voluntary manslaughter based upon an unreasonable but honest belief that circumstances justified the use of deadly force. See K.S.A. 21-3403(b) (Voluntary manslaughter is an intentional killing based on "an unreasonable but honest belief that circumstances existed that justified deadly force [in defense of a person].)". The court held that the case's facts did not fall within the involuntary manslaughter definition of "a lawful act in an unlawful manner."
Houston argued to the Court of Appeals that "the jury could have easily found that Mr. Houston unintentionally killed Mr. Johnson based on Mr. Houston's excessive use of force for self defense." (Emphasis added.) The panel generally recited the correct standard of review: whether the jury could have reasonably convicted the defendant of involuntary manslaughter. But the *826 panel did not appear to analyze whether the killing was unintentional under this standard. Rather, it appeared to reject Houston's position purely on the sua sponte basis of lack of self-defense. It concluded that "[b]ased upon the overwhelming evidence ... Houston was not lawfully acting in self-defense, [and] the district court did not err in failing to instruct the jury on involuntary manslaughter." (Emphasis added.) Slip op. at 7. Of course, when analyzing the issue of involuntary manslaughter, the exercise of the right of self-defense is typically accepted as a lawful act, but the "unlawful manner" of committing that lawful act is the excessive use of force. See Gregory, 218 Kan. at 186, 542 P.2d 1051.
As a result, the panel failed to address Houston's specific argument. Moreover, when it sua sponte addressed the larger question of whether Houston was lawfully acting in self-defense, it also apparently failed to consider that the trial court had instructed on self-defense  which neither party suggests was erroneous under the facts of this case.
To this court, Houston again argues that the killing was unintentional, thus warranting an instruction on involuntary manslaughter. See K.S.A. 21-3404(c) (involuntary manslaughter is an unintentional killing). According to his supplemental brief, "if Mr. Houston did not intend to kill Mr. Johnson, but his excessive use of force in self-defense resulted in Mr. Johnson's death, then the proper conviction would have been involuntary manslaughter." Houston contends that his testimony suggests he intentionally acted in self-defense against Johnson, "but that he did not intend to cause Mr. Johnson's death." At oral arguments, the State directly responded to this contention, arguing that Houston's killing of Johnson was indeed intentional.
Our analysis of this particular argument requires a review. The legislature has established the parameters for when jury instructions on lesser included offenses should be given. K.S.A. 22-3414(3) provides in relevant part:
"In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (2) of K.S.A. 21-3107 and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime." (Emphasis added.)
In State v. Anderson, 287 Kan. 325, 333, 197 P.3d 409 (2008), we reiterated our current standards for reviewing jury instructions on lesser included offenses. We defined that standard recently in the murder case of State v. White, 284 Kan. 333, 347, 161 P.3d 208 (2007):
"`"A trial court must instruct the jury on a lesser included offense `where there is some evidence which would reasonably justify a conviction' of the lesser offense. [Citation omitted.] `If the defendant requests the instructions, the trial court has a duty to instruct the jury regarding all lesser included crimes that are established by the evidence, regardless of whether the evidence is weak or inconclusive.' [Citation omitted.] `However the duty to so instruct arises only where there is evidence supporting the lesser crime.' [Citation omitted.]. An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. [Citation omitted]."' State v. Boyd, 281 Kan. 70, 93, 127 P.3d 998 (2006) (quoting State v. Drennan, 278 Kan. 704, 712-13, 101 P.3d 1218 [2004])." (Emphasis added.)
Accord State v. Reid, 286 Kan. 494, 522, 186 P.3d 713 (2008); see also State v. Pham, 281 Kan. 1227, Syl. ¶ 22, 136 P.3d 919 (2006) ("The instruction need not have been given if the evidence would not have permitted a rational factfinder to find the defendant guilty beyond a reasonable doubt of the lesser included offense."); State v. Jones, 279 Kan. 395, 401, 109 P.3d 1158 (2005) (same).
In determining whether the defendant is entitled to instructions on his or her lesser included offense claim, the evidence must be viewed in the light most favorable to the defendant. State v. Horn, 278 Kan. 24, 40, 91 P.3d 517 (2004).
*827 In support of Houston's argument that he did not intend to kill Johnson, he points to his own testimony that (1) he only shot Johnson because he thought Johnson was reaching for a weapon and that (2) "initially the shooting was not intentional." The primary testimony upon which Houston relies actually states:
"[PROSECUTOR]: What did you think you were going to do with the gun?
....
"[HOUSTON]: ... To protect myself if needed.
"[PROSECUTOR]: Were you intending to go shoot somebody?
"[HOUSTON]: No, sir.
"[PROSECUTOR]: Were you intending to go shoot Josh Johnson?
"[HOUSTON]: No, sir." (Emphasis added.)
Viewing this testimony in the light most favorable to Houston, however, does not override his own testimony that clearly established that whatever his intent may have been initially, it ripened into an intent to shoot Johnson. He has never contended, for example, that the shooting was an accident.
"[PROSECUTOR]: Mike, you pulled the trigger on that shotgun that we've seen?
"[HOUSTON]: Yes, sir, I did.
"[PROSECUTOR]: Why did you do that?
"[HOUSTON]: I mean reaction is a response from the reaction that he was doing....
"[PROSECUTOR]: Okay. You pulled the trigger?
"[HOUSTON]: Yes, sir.
"[PROSECUTOR]: This was in reaction to his movement?
"[HOUSTON]: Yes, sir.
"[PROSECUTOR]: The right hand movement?
"[HOUSTON]: Yes, sir."
Houston's testimony elaborated upon Johnson's "right hand movement" to which he reacted and further established that the shooting clearly was intentional:
"In the process of him coming out [of the car], as he was pushing his door open, he was reaching back ['for what I knew had to be a weapon of some type']. I come around just about when he wasn't quite standing up, but he was almost standing up, when I come around the car and this is when I swung my gun up and I pulled the trigger which knocked him back." (Emphasis added.)
Although the shooting of Johnson was clearly intentional, the question remains whether the killing of Johnson was intentional. Rather than examine all of the facts as the panel appeared to do, reviewing several salient ones will suffice.
We initially observe that Houston told the police the day after the shooting, "I said I'm tired of this shit, I got out of the car with my gun and I walked around and pulled the trigger." Although some of his later trial testimony was not entirely consistent with his statement to police, he has never disputed that he intentionally pulled the trigger. Nor has he ever disputed that he shot Johnson in the left jaw with a 12-gauge shotgun. And through the close of oral arguments to this court, Houston has never contended that he was not intentionally aiming at Johnson's head. Contrast State v. Mitchell, 23 Kan. App.2d 413, 416-17, 422, 932 P.2d 1012 (1997) (Defendant claimed victim had pulled a gun on him and he was afraid for his life, so he pulled out his own gun, closed his eyes, and began shooting. Reversed and remanded for instruction on involuntary manslaughter.).
Additionally, it is uncontroverted that Houston fired his shotgun at Johnson from within 15 feet. Houston admitted to the police the day after the shooting that he fired from 8 to 10 feet; Ashley Walker testified Houston fired from 6 to 7 feet. Based upon the medical evidence, the coroner opined that the shooting range could have been as close as 3 feet, and that he "would be surprised" if it were as far as 15 feet. The jury read a transcript of Houston's police statement, heard the testimony of Ashley and the coroner, and saw a photograph of the empty shotgun shell  ejected from Houston's gun  lying in the middle of the street opposite Johnson's driver's-side door. Perhaps most compelling to the jurors, they saw a photograph *828 of the shotgun blast's damage to Johnson's jawline.
Under these circumstances, we conclude that no rational jury in this state could have found that Houston did not intend to kill Johnson. Because involuntary manslaughter requires an unintentional killing, the evidence would not reasonably justify a conviction of that crime. See K.S.A. 22-3414(3). Accordingly, the trial court did not err in refusing such an instruction.
In light of this holding, we need not reach the Court of Appeals' alternative holding: application of the skip rule. See Horn, 278 Kan. at 40, 91 P.3d 517.
We acknowledge that several weeks after oral argument Houston's counsel filed a 4-page "letter of additional authority pursuant to Supreme Court Rule 6.09(b) (2008 Kan. Ct. R. Annot. 47)." The letter cited several of this court's decisions concerning the appellate standard of review regarding jury instructions for lesser included offenses. See, e.g., State v. Hoffman, 288 Kan. 100, 200 P.3d 1254 (2009). Those decisions, although postdating Anderson, Reid, White, Boyd, and Drennan, do not articulate the standard of review as precisely as the one identified in this opinion. More particularly the statement in Hoffman, 288 Kan. at 104-05, 200 P.3d 1254, that "the evidence of the lesser crime does not have to be strong or extensive as long as the jury might reasonably infer the lesser crime from that evidence" is a less precise form of the standard from K.S.A. 22-3414(3) ("some evidence which would reasonably justify a conviction of some lesser included crime") and from other case law, e.g., Anderson, 287 Kan. at 333, 197 P.3d 409 (instruction "`"is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented"'"). Accordingly, use of the clearer standard of review articulated in the instant opinion is preferable.
Houston's letter cites to those decisions to address "the questions at oral argument concerning the standard of review for determining whether the district court was required to instruct the jury on involuntary manslaughter." This statement generally represents a correct application of Rule 6.09(b). That rule states in relevant part:
"(b) When significant relevant authorities not previously cited to the court come to the attention of a party after the party's brief has been filed, or after oral argument but before decision, the party shall promptly advise the court, by letter, setting forth the citations. There must be a reference either to the page(s) of the brief intended to be supplemented or to a point argued orally to which the citations pertain. A brief statement may be made concerning application of the citations."
But while "a brief statement may be made concerning application of the citations," providing two pages of purely factual statement  with citation to the record  is not a correct application of the rule. In the instant case, these facts purportedly supporting the claim for an involuntary manslaughter instruction  many of which appeared for the first time in the letter  should have been argued in (1) Houston's brief to the Court of Appeals, (2) Houston's petition for review, or (3) Houston's supplemental brief to this court. Rule 6.09 was not intended to be, nor should it be, used as yet another briefing opportunity. The appellate courts will not consider those parts of a Rule 6.09 letter that fail to comply with the rule.

Issue 5: Cumulative error did not deny Houston a fair trial.

Houston next argues that cumulative error requires reversal of his conviction and remand for a new trial. The State responds that no error was committed; but if error exists, any accumulation did not deny Houston a fair trial.
In the absence of any error, none can accumulate. See State v. Sharp, 288 Kan. ___, 210 P.3d 590 (2009). The presence of one error is obviously insufficient to accumulate. See State v. Davis, 283 Kan. 569, 583, 158 P.3d 317 (2007). To the extent that more than one error may have occurred, we observe that cumulative trial error requires reversal when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. Reid, 286 Kan. 494, Syl. ¶ 20, 186 P.3d 713.
*829 The errors, if any, were harmless, both singly and collectively. The totality of circumstances did not substantially prejudice Houston and deny him a fair trial.

Issue 6: The trial court did not violate Houston's rights under the Sixth and Fourteenth Amendments.

Finally, Houston argues that the trial court violated his Sixth and Fourteenth Amendment rights under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), when it sentenced him to the aggravated sentence in the grid block  165 months  without requiring that the aggravating factors be charged in the complaint, put before a jury, and proved beyond a reasonable doubt. More specifically, he contends that this court should overrule its recent decision in State v. Johnson, 286 Kan. 824, 190 P.3d 207 (2008). There, we held that Kansas appellate courts are without jurisdiction to consider challenges to a presumptive sentence, even if that sentence is to the highest prison term in a Kansas Sentencing Guidelines presumptive grid block and even if the aggravator is not proved to a jury beyond a reasonable doubt.
The Court of Appeals concluded it was without jurisdiction to review Houston's presumptive sentence. Slip op. at 8. While Houston asks us to reconsider Johnson, he has not presented any new facts or law that merit reconsideration of this issue. Accordingly, we see no reason to retreat from that position now.
Affirmed.