Nos. 91,042,
91,120

STATE OF KANSAS, *Appellee*, v. CRYSTAL KAY SWINNEY, *Appellant*.
STATE OF KANSAS, *Appellee*, v. JAMES LEON RICH, II, *Appellant*.
(127 P.3d 261)

Opinion filed February 3, 2006.

*John Val Wachtel*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, argued the cause, and *Roger L. Falk*, of the Law Office of Roger L. Falk & Associates, P.A., of Wichita, and *Christopher L. Hughes*, of the same firm, were with him on the briefs for appellants.

*Ernest H. Richardson*, county attorney, argued the cause, and *Julie A. Funk*, special county prosecutor, of Dodge City, and *Phill Kline*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

BEIER, J.: The defendants, Crystal Swinney and James Leon Rich, II, appeal their convictions of manufacturing methamphetamine, possession of methamphetamine, possession of pseudoephedrine with the intent to manufacture methamphetamine, and possession of drug paraphernalia with the intent to manufacture methamphetamine. Their appeals were consolidated before the Court of Appeals, which affirmed the defendants' convictions but vacated their sentences for manufacturing methamphetamine and remanded for resentencing on those counts under *State v. McAdam*, 277 Kan. 136, 83 P.3d 161 (2004). *State v. Swinney*, Nos. 91,042, 91,120, unpublished opinion filed December 23, 2004.

On petition for review to this court, the defendants raise the following challenges to their convictions: (1) Their motions to suppress should have been granted; (2) there was insufficient evidence to support their convictions; and (3) the prosecutor committed reversible misconduct during questioning of witnesses and closing argument.

The defendants also have filed "Motions to Stay Proceedings and Remand for Resentencing." This opinion makes these motions moot and they are, therefore, denied.

## Relevant Facts and Procedural History

The defendants' legal difficulties began when two boys discovered what they believed to be a methamphetamine laboratory while hunting. The boys found a barrel containing two bottles beside a shed. One of the bottles was smoking, and the other was coated with a white residue. The boys also smelled ether.

One of the boys informed his uncle, Steve Holmes, of the discovery. Holmes happened to be a detective with the Pratt County Police Department, and he was under the impression that the land on which the barrel and shed stood belonged to the other boy's family. The same day, Holmes called the Pratt County Sheriff's Department and met Detective Jeff Ward and Deputy Mark Holloway at the site of the barrel and the shed.

The officers observed a dilapidated shed near an old chicken house and abandoned cars. The shed had a hole in its roof; its side

door was open; and its garage-type door was off its track. The officers found the barrel and observed the bottles, which they determined were gassing generators used in manufacturing methamphetamine.

At that point, the officers decided to conduct random surveillance of the site and sought permission from the family they believed to be the owner of the land. For several days, the officers made intermittent visits to the site but failed to apprehend the manufacturers. They were able to determine, however, that the lab was an ongoing operation because some of the drug paraphernalia at the site was moved around from one visit to the next.

Finally, Holloway visited the site again and reported to Ward that he had entered the shed and found two pitchers of "meth oil." The officers then elected to begin constant surveillance, which paid off approximately 15 minutes later, when a red Pontiac approached the shed. The officers then saw two persons, later identified as defendant Rich and Ricky Rodriguez, exit the car, enter and leave the shed, and return to the car.

At this point, the officers emerged from their hiding places and ordered everyone out of the car. Rich yelled, "Drive, drive, go, go, go," but the car did not move. Ward apprehended the driver, defendant Swinney; and Holloway apprehended the passengers, Rich and Rodriguez. Swinney and Rich, who were in the front seat, each had a pitcher of meth oil. Rodriguez, in the back seat, had a container of Morton salt at his feet, as well as several bottles, tubing, and a backpack "that contained a yellow container full of a clear liquid that tested as acid."

Rich informed the officers that he owned the land on which the shed stood. When the officers learned that the ownership of the property differed from their original understanding, they obtained a search warrant.

Swinney and Rich filed motions to suppress. They argued that the land was not owned by the family from whom the officers sought permission for random surveillance. The State countered that the officers' behavior was permitted by the open fields doctrine. The district court denied the defendants' motions.

Swinney, Rich, and Rodriguez were tried together. Rich testified. He claimed that he, Swinney, and Rodriguez had gone to the shed on the day of their arrests because he had received a phone call warning him there was unspecified "stuff" at the site that could get him in trouble. The defendants took the position at trial that they were unaware of the illegal character of the lab and its various items of equipment and materials.

During cross-examination of Rich and during the questioning of a rebuttal witness, the prosecutor attempted to inject evidence of other drug activity by Rodriguez. Rodriguez had admitted to methamphetamine use in probation revocation proceedings after an earlier conviction. The record reveals that the district judge sustained at least three defense objections to introduction of this evidence, as well as admonishing the prosecutor about forcing a mistrial no fewer than three times.

Rich's father, James Rich ("Rich Senior"), also testified. He said that the land on which the shed stood belonged to his family and that he had stored antiques in the shed in the past. Rich Senior also said he had experienced a problem with trespassers on the land and had attempted unsuccessfully to involve police in solving the problem. Because of this past police inaction, he said, he had not recently reported trespassers at the site. He further testified that he had visited the site "maybe twice" the previous year.

During closing argument, the prosecutor stated that no evidence had been brought forward to controvert the allegation that Swinney had knowledge of methamphetamine.

On appeal to the Court of Appeals, Swinney and Rich argued that their motions to suppress should have been granted because the officers lacked a search warrant; the defendants had a reasonable expectation of privacy in the area searched; and any evidence obtained after the initial illegal entry constituted fruit of the poisonous tree. A majority of the Court of Appeals panel determined that the search of the property was legal pursuant to the open fields doctrine. Thus, the fruit of the poisonous tree rule was inapplicable.

Judge Richard Greene dissented from the portion of the majority's decision approving the officers' entry into and search of the

shed, considering it an "unwarranted extension of the 'open fields' exception to Fourth Amendment protections." *Swinney*, slip op. at D-1. He wrote:

"Neither the State nor the majority has cited authority to suggest that an enclosed structure, albeit in poor or run-down condition, may be entered and searched without Fourth Amendment protection, merely because it is located within an 'open field,' especially where the person claiming protection asserts a reasonable expectation of privacy in the location. In fact, the entire stated rationale for the exception is notably inapplicable to structures standing on 'open fields.' " Slip op. at D-3 (Greene, J., dissenting).

## Motion to Suppress

On appeal of a district court decision on a motion to suppress evidence, the appellate court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusions drawn from the facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the propriety of the suppression of evidence is a legal question requiring independent appellate review. *State v. Vandevort*, 276 Kan. 164, 169, 72 P.3d 925 (2003).

Before this court, Swinney and Rich agree with Judge Greene's dissent but cite no case law to support the argument that their motions to suppress should have been granted because the police officers' warrantless entry and search of the shed was an impermissible extension of the open fields doctrine.

The open fields doctrine, which provides an exception to the search warrant requirement of the Fourth Amendment was first recognized by United States Supreme Court in *Hester v. United States*, 265 U.S. 57, 59, 68 L. Ed. 898, 44 S. Ct. 445 (1924), which held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields."

Sixty years later, the Court clarified the open fields doctrine in *Oliver v. United States*, 466 U.S. 170, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984). The *Oliver* decision arose out of two cases involving similar facts.

In the first case, Kentucky police officers found a marijuana field approximately 1 mile from defendant Ray E. Oliver's home, and

the federal district court determined Oliver had a reasonable expectation of privacy in the area of the farm that had been searched. According to the district court, Oliver " 'had done all that could be expected of him to assert his privacy in the area of farm that was searched.' " 466 U.S. at 173. The Sixth Circuit Court of Appeals reversed, and the Supreme Court granted certiorari.

In the second case, Maine police officers discovered two marijuana patches surrounded by chicken wire in the woods behind defendant Richard Thornton's home. The state trial court granted Thornton's motion to suppress, noting that Thornton had posted "No Trespassing" signs and that "the secluded location of the marijuana patches evinced a reasonable expectation of privacy." 466 U.S. at 175. The Maine Supreme Judicial Court affirmed, and the Supreme Court granted certiorari.

The justices voted 6-3 against suppression, stating the Court's 1924 *Hester* decision "was founded upon the explicit language of the Fourth Amendment. That Amendment indicates with some precision the places and things encompassed by its protections." *Oliver,* 466 U.S. at 176. The Court further stated its interpretation was consistent with the right to privacy concept extant in Fourth Amendment jurisprudence.

"Since *Katz v. United States,* 389 U.S. 347[, 19 L. Ed. 2d 576, 88 S. Ct. 507] (1967), the touchstone of Fourth Amendment analysis has been the question whether a person has a 'constitutionally protected reasonable expectation of privacy.' [Citation omitted.] The Amendment does not protect the merely subjective expectation of privacy, but only those 'expectation[s] that society is prepared to recognize as "reasonable." ' [Citations omitted.]" *Oliver,* 466 U.S. at 177.

The Court contrasted those areas in which a person has an expectation of privacy with open fields, which "do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields." 466 U.S. at 179. The Court held that open fields were, as a practical matter, accessible to the public and the police in ways a home, an office, or commercial structure would not be; nor do fences or "no trespassing" signs effectively bar the public from viewing open fields.

466 U.S. at 179. Moreover, "the public and the police lawfully may survey the lands from the air. For these reasons, the asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.' " 466 U.S. at 179. In short, "from the text of the Fourth Amendment and from the historical and contemporary understanding of its purposes, . . . an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers." 466 U.S. at 181.

The *Oliver* decision also cautioned that a mere case-by-case analysis would fail to arrive at workable accommodations between the needs of law enforcement and Fourth Amendment interests. 466 U.S. at 181-82. And a purely subjective inquiry into whether a particular individual attempted to conceal what he or she asserted as a "private" activity would be insufficient. 466 U.S. at 182. Rather, the Court said the correct question would be "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." 466 U.S. at 182-83. The Court reaffirmed the *Hester* rule and clarified that it "may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home. [Citation omitted.]" *Oliver,* 466 U.S. at 178; see also *United States v. Dunn,* 480 U.S. 294, 304-05, 94 L. Ed. 2d 326, 107 S. Ct. 1134 (1987) (police officers standing in open field permitted to look into barn, even if defendant had reasonable expectation of privacy in it; use of flashlight to illuminate inside of barn did not transform officers' observations into unreasonable search).

This court has not previously addressed the open fields doctrine under either federal or state constitutional provisions, but we have concluded that the Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights "are identical for all practical purposes. If conduct is prohibited by one, it is prohibited by the other." *State v. Kimberlin,* 267 Kan. 659, 664, 984 P.2d 141 (1999). The converse also is necessarily true. If law enforcement conduct is permitted by one, it is permitted by the other. This court has long recognized and applied the concept of curtilage in various factual contexts. See, *e.g., Kim-*

*berlin,* 267 Kan. at 665-66 (evaluation of trash seizure; "basic attributes" of curtilage include seclusion, use for "intimate activities associated with the sanctity of the home"); *State v. Berry,* 223 Kan. 102, 106, 573 P.2d 584 (1977) (seizure of drugs from motel shrubbery; shrubbery part of general landscaping, not part of curtilage of motel room); *State v. McClelland,* 215 Kan. 81, 82-85, 523 P.2d 357 (1974) (search of defendant's person approved; defendant within "premises" including curtilage to be searched when standing in parking area immediately in front of house); *State v. White,* 83 Kan. 416, 418, 111 Pac. 437 (1910) (analyzing barn where liquor consumed; referencing common-law rule "that buildings within curtilage are for some purposes considered parts of a dwelling house"); *State v. Bugg,* 66 Kan. 668, 671, 72 Pac. 236 (1903) (for purpose of burglary statute, building within curtilage if situated within "such close proximity to the dwelling as to be conveniently accessible, and is actually used in connection with the dwelling for domestic purposes, although neither is enclosed"); *Zimmerman v. Franke,* 34 Kan. 650, 654-55, 9 Pac. 747 (1886) (garnishment; including residence within curtilage in definition of "family").

Our Court of Appeals has recognized and applied the United States Supreme Court's open fields holdings of *Dunn, Oliver,* and *Hester,* as well as the concept of curtilage. Its decision in *State v. Tinsley,* 16 Kan. App. 2d 287, 823 P.2d 205 (1991), is particularly noteworthy.

In *Tinsley,* a police officer discovered marijuana growing behind the defendant's barn and later obtained a search warrant. Defendant Everett Tinsley's motion to suppress was denied based on the open fields doctrine, but, on appeal, he asserted that, even if the open fields doctrine applied in Kansas, the marijuana was growing within the curtilage of his home.

The *Tinsley* panel employed four factors enumerated in *Dunn,* 480 U.S. 301, to assist in determining whether a given area qualified as curtilage: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Tinsley,* 16 Kan.

App. 2d at 290-91 (citing *Dunn*, 480 U.S. at 300-01). These factors should not be applied mechanically, but they are "useful analytical tools . . . to the degree that, in any given case, they bear upon the centrally relevant consideration — whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301.

In *Dunn*, the United States Supreme Court concluded that a barn located 60 yards from a home and not within an area enclosed by a fence surrounding the house, lay outside the curtilage of the house. 480 U.S. at 300-05. Likewise, the *Tinsley* panel upheld the district court's rejection of the defendant's motion to suppress, ruling that the marijuana field at issue was not within the curtilage of Tinsley's home. 16 Kan. App. 2d at 291.

Considering our previous cases and the United States Supreme Court's *Dunn* factors in light of the record before us, we are able to conclude easily that the site of the meth lab in this case was not within the curtilage of any home. There was no evidence regarding the site's proximity to a home, and Rich Senior testified he had previously used the site for storage but had ceased doing so. He had visited the site rarely in the recent past, and he had given up on seeking police intervention to deter trespassers. The site, including what could be seen from outside the shed, was an open field.

Had the officers only conducted surveillance, eventually arresting the defendants and seizing the items in their possession, our analysis would end here. As the United States Supreme Court said in *Dunn*: "Under *Oliver* and *Hester*, there is no constitutional difference between police observations conducted while standing in a public place and while standing in the open fields." 480 U.S. at 304. But at least one of the officers involved in this case also entered and searched the shed at the site. We must therefore consider whether those warrantless actions violated the Fourth Amendment or, if so, whether the actions constituted harmless error.

Sister jurisdictions that have dealt with similar factual situations have consistently commented that the warrantless search of a struc-

ture or outbuilding located in an open field presents a close question. See, *e.g.*, *United States v. Pennington*, 287 F.3d 739, 745-46 (8th Cir. 2002) ("very close issue"; warrantless search of underground bunker in open field with visible entryway, ladder, no lock or door; determined no error in denying motion to suppress but "[open fields doctrine] does not justify a warrantless search of a man-made enclosure found in an open field"); *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001) (warrantless search of barn invalid under *Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); doors usually locked, within fenced area, less than 60 feet from home); *United States v. Ramapuram*, 632 F.2d 1149, 1152-54, 1156 (4th Cir. 1980) ("far from easy question"; warrantless search of open trunk of "junker" car in open field; search upheld after lengthy balancing under *Katz*); *United States v. Longie*, 370 F. Supp. 2d 941, 945-46 (D.N.D. 2005) (warrantless search of unused shed improper under *Katz*; police's search warrant for house did not extend); *People v. Pitman* 211 Ill. 2d 502, 518-20, 813 N.E. 2d 93 (2004) (warrantless search of unused barn with one open side, doors unlocked and wide open, acceptable because abandoned; Illinois Supreme Court reversed under *Katz* after lengthy discussion; noted officers had opportunity to obtain warrant).

We need not answer this close question on the facts before us. Even if we assume that the officer overstepped by entering and searching the shed, such a ruling would not have made a difference in the outcome of this case. See *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (harmless standard for constitutional error). He and his fellow officers had already conducted surveillance of the site for several days. They had already seen the gassing generators in the barrel outside of the shed and had observed rearrangement of items, demonstrating an ongoing operation between visits. These observations provided sufficient probable cause to arrest Swinney, Rich, and Rodriguez, which in turn supported seizure of the items in their possession. The evidence regarding the officers' observations, the items found in the defendants' possession or within easy reach at the time of their arrest, and Rich's vague and implausible testimony about the warn-

ing telephone call amply supported the jury's verdicts. A ruling that the entry and search of the shed were impermissible would have excluded none of this evidence; thus, we conclude beyond a reasonable doubt that any error resulting from entering and searching the shed would not have changed the jury's verdicts.

## Sufficiency of the Evidence

Swinney and Rich next argue that, if their motions to suppress had been granted, the remaining evidence would have been insufficient to support their convictions. They state the incorrect standard of review. The proper standard of review is whether, after review of all of the evidence, viewed in the light most favorable to the State, the appellate court is convinced that a rational jury could have found the defendants guilty beyond a reasonable doubt. *State v. Mays*, 277 Kan. 359, 377, 85 P.3d 1208 (2004).

As discussed above, we have already concluded that the evidence supported the convictions, even if the entry and search of the shed was improper. The open fields doctrine supported the highly incriminating surveillance conducted, and the surveillance led to the defendants' arrests and the seizure of additional damning evidence. Regardless of the ruling on the motion to suppress evidence observed in the shed, the jury still would have known: (1) an on-going meth lab was located at the site; (2) the defendants drove directly to the site and parked; (3) two of the defendants, Rich and Rodriguez, exited the car, entered and exited the shed, and returned to the car; and (4) when the defendants were arrested, the officers found many items in their possession indicative of "cooking" methamphetamine. Finally, Rich admitted he and his codefendants went to the site because he was warned items there could get him in trouble.

We also note that the jury was correctly instructed on the elements of the crimes charged and on aiding and abetting under K.S.A. 21-3205. In light of our review of the evidence, we have no hesitation in concluding that a rational jury could have found the defendants guilty beyond a reasonable doubt on all of the charges for which they stand convicted.

### Prosecutorial Misconduct

Both the defendants assert on appeal that the prosecutor improperly questioned defendant Rich and that the judge did not caution the jury to disregard those questions. They claim that this violated their rights to a fair trial. Defendant Swinney also claims that the prosecutor committed error in improperly calling attention to her failure to testify, and that the prosecutor improperly shifted the burden of proof to the defendants during closing argument. She further claims that the cumulative effect of the prosecutor's questions and statements in closing argument denied her a fair trial.

The State contends that the prosecutor's questioning did not rise to a level of misconduct and that, in any event, the questions did not prejudice the jury and were not motivated by ill will. In addition, in the State's view, the evidence against the defendants was overwhelming. The State also argues the prosecutor's statements during closing argument were proper comments on the evidence and did not shift the burden of proof.

A defendant need not object to alleged prosecutorial misconduct in order to preserve the issue for appeal; the same standard of review applies regardless of whether an objection was made. See *State v. Dixon*, 279 Kan. 563, 581, 112 P.3d 883 (2005) (citing *State v. Davis*, 275 Kan. 107, 122, 61 P.3d 701 [2003]).

This court's decision in *State v. Tosh*, 278 Kan. 83, Syl. ¶¶ 1, 2, 91 P.3d 1204 (2004), sets forth the governing two-step analysis for allegations of prosecutorial misconduct. This standard applies regardless of whether the alleged misconduct occurs during witness examination or during closing argument. See *Dixon*, 279 Kan. at 590-92; *State v. Overton*, 279 Kan. 547, 558-60, 112 P.3d 244 (2005); *Tosh*, 278 Kan. at 87-89 (cross-exam), 89-93 (closing argument).

The first step asks whether the complained-of conduct was outside the considerable latitude given a prosecutor in discussing the evidence. The second step asks whether the remarks constituted plain error, that is, whether the statements prejudiced the defendant and denied him or her a fair trial. *Dixon*, 279 Kan. at 590-91;

see *Overton,* 279 Kan. at 558-59. The second step requires three factors to be considered: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors, unless the harmless error tests of both K.S.A. 60-261 and *Chapman,* 386 U.S. 18, have been met. *Dixon,* 279 Kan. at 592 (quoting *Tosh,* 278 Kan. 83, Syl. ¶ 2).

We do not regard the prosecutor's questions as misconduct. In a case where drug defendants take the position that they were ignorant of the illegal nature of a meth lab at which they are arrested or its accouterments found in their possession, as these defendants did, a prosecutor may, under certain circumstances, introduce evidence of the defendants' prior involvement with drugs. See *State v. Gibson,* 30 Kan. App. 2d 937, 943-46, 52 P.2d 339 (2002). If the evidence comes in to prove intent under K.S.A. 60-455, a limiting instruction should be given.

Here, the district judge repeatedly intervened before a limiting instruction would have been required. He was suitably sensitive to painting a defendant with no prior drug activity with the same brush used on one with such activity. He apparently stepped in to prevent it. This is exactly the type of courtroom control we have encouraged in other prosecutorial misconduct discussions. See, *e.g., State v. Sperry,* 267 Kan. 287, 308-09, 978 P.2d 933 (1999) (district judge has independent duty to protect a defendant's right to fair trial); *State v. Wilson,* 188 Kan. 67, 72-73, 360 P.2d 1092 (1961) (court has duty to stop counsel from referring to facts not in evidence or appealing to prejudice of jury).

The prosecutor's misstep here, if any, was flirtation with contempt of court by failing to abide by the district judge's rulings immediately; but we see no error vis-a-vis these defendants.

Swinney also alleges prosecutorial misconduct in closing argument, asserting that the prosecutor improperly shifted the burden of proof and improperly commented on her failure to testify.

Swinney contends that the prosecutor's remarks suggested to the jury that the defense had a responsibility to prove she knew nothing about methamphetamine production and that it failed to carry this burden because Swinney did not testify. This argument lacks merit. The jury was correctly instructed that the burden of proof rested on the State. Defense counsel, in closing argument, referred to the State's burden of proof. Furthermore, the prosecutor's argument focused on the date and place of the occurrence, which were never in dispute.

Swinney also argues that the prosecutor's assertion that evidence was uncontroverted is not permissible if the only person who can rebut the evidence was the defendant.

This argument is equally unconvincing. When a jury has been properly instructed that the State bears the burden of proof, a prosecutor may argue inferences based on the balance or lack of evidence, provided the remarks do not indirectly command an adverse inference regarding the defendant's failure to testify. *State v. McKinney*, 272 Kan. 331, 346, 33 P.3d 234 (2001). We do not see that problem here.

Finally, Swinney also argues that the cumulative effect of the prosecutor's alleged misconduct during witness examination and closing argument denied her a fair trial. Having found no error, we cannot apply the cumulative error doctrine.

The defendants' convictions are affirmed, their sentences for manufacturing of methamphetamine are vacated, and the consolidated cases are remanded for resentencing consistent with *State v. McAdam*, 277 Kan. 136, 83 P.3d 161 (2004).

Affirmed in part, vacated in part, and remanded with directions.

LARSON, S.J., assigned.