No. 100,768

STATE OF KANSAS, *Appellee*, v. CHRISTOPHER TAHAH, *Appellant*.

(262 P.3d 1045)

Opinion filed September 30, 2011.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Natalie K. Randall*, assistant county attorney, argued the cause, and *Terry J. Malone*, county attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: A jury convicted Christopher Tahah of felony murder and the underlying felony: discharge of a firearm at an occupied dwelling resulting in great bodily harm. The court sentenced him to prison without the possibility of parole for 20 years for the felony-murder conviction and 102 months for the underlying felony, with the sentences to run consecutively. Our jurisdiction of his direct appeal is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

The issues on appeal and our accompanying holdings are as follows:

1. Did the district court err in refusing to give a lesser-included offense instruction on second-degree unintentional murder and involuntary manslaughter? Yes.
2. Did the district court erroneously exclude third-party evidence? No.
3. Did the prosecutor commit reversible misconduct during closing argument? Harmfulness of error not required to be addressed because of reversal and remand on other grounds.
4. Did the district court err in admitting evidence under K.S.A. 60-455? Not preserved for appeal.
5. Was Tahah's confession voluntary? Not preserved for appeal.

## FACTS

Christopher Tahah was an officer with the Dodge City Police Department. In December 2006, Tahah met Erin Jones and they began to date. He would occasionally spend the night at Jones' house, and he moved some of his personal items into her house. The two vacationed together as well.

On April 9, 2007, Jones sent Tahah a text message that said something was bothering her and told him to check his email. Jones' email stated that she did not feel they were compatible and that she wanted to end the relationship. Tahah was blindsided and hurt by the news. The next day, he moved his belongings out of Jones' house.

A few days later, on April 13, Tahah saw Jones riding in a truck with an unknown male. Tahah testified that he contemplated following them but went home instead. Around 11:30 p.m., Tahah went to Jones' house. Tahah testified that he did not think she would answer the front door so he used the code that opened the garage door, walked through the garage, and entered the house.

According to Tahah, Jones was scared by his entry, but she eventually calmed down. Tahah entered Jones' house to get an explanation for the break up, and she explained they broke up because she felt they were sexually incompatible and because he snored.

One of Jones' friends, Vanessa Weber, stated that Tahah's April 13 entry into Jones' house greatly affected Jones. According to Weber, Jones told her it was "the scariest night of her life." After the incident Weber would help Jones search the house to make sure no one was hiding inside. Jones also changed the garage code.

According to Tahah, several weeks later on May 4, he drank alcohol while helping a friend paint a house in the early evening. Around 9:30 p.m., Tahah and several friends went barhopping. They eventually stopped at the Central Station bar where Tahah saw Jones dancing with another man. This sight upset Tahah, and he and his friends left the bar for another. Around 1:30 a.m. the next morning, Tahah left his friends at the bar and returned to his apartment. Tahah stated that he consumed alcohol at every bar he entered that night.

Weber testified that she was with Jones for most of May 4. According to Weber, they attended a Dodge City Legends' basketball game that evening through tickets Jones received from a member of the Legends, Elvin Mims. Jones had recently met Mims and was communicating with him through the internet website "MySpace" and by exchanging text messages. Around 11:30 p.m., Weber and Jones went to Central Station where Jones ran into another friend,

Jason Carpenter. Jones had a few drinks with Carpenter and danced with him a couple of times. Jones and Weber then returned to Jones' house, and Weber left around 3:20 a.m. the next day.

Around noon, Weber entered Jones' backyard because Jones had not responded to phone calls. After seeing that the window on Jones' bedroom door was broken, Weber called 911. Authorities would later learn that Jones was inside and dead from a single gunshot to the head.

According to Tahah, on May 5, the day of Jones' death, he woke up around 12:45 p.m. Around 4 p.m., Sergeant Slickers of the Dodge City Police Department arrived at Tahah's apartment along with KBI Agents Jason LaRue and Mark Kendrick. The KBI officials took Tahah's service weapon and then conducted their first of three interviews.

During the May 5 interview, the KBI agents informed Tahah that Jones was dead. Tahah cried upon hearing the news. Agent LaRue testified that during the interview Tahah stated that he had considered revenge on Jones but that he never acted on it.

KBI officials prohibited Tahah from reentering his apartment and secured a search warrant. The officers then searched Tahah's apartment on May 6 and May 11. They seized several items including one Winchester .270 Rifle, a single Winchester "Short Mag" .270 shell casing stored in a "Chinese puzzle box," and a dark ski mask. After searching Tahah's trash, the officers recovered two more Winchester Short Mag .270 shell casings, several pieces of dark clothing, and shoes. Once the officers finished searching Tahah's apartment on May 6, he was allowed to return home.

The next day, May 7, Tahah spoke during a second interview with KBI officials LaRue and John Nachtman at his apartment. They questioned Tahah about his relationship with Jones. After the interview, Tahah decided to "get out of Dodge."

Tahah drove to Denver, Colorado. According to his trial testimony, Tahah did not eat and contemplated suicide multiple times. On May 11, Tahah "made a decision to come back to Dodge to try to explain myself to the agents." Because Tahah did not have enough gas to make the return trip, he stole a hotel guest's idling Hummer.

While Tahah was driving the stolen Hummer east on Interstate 70 towards Limon, Colorado, Colorado State Patrol officers signaled him to pull over because On-Star was tracking a stolen Hummer on I-70. Tahah pulled over and searched the Hummer for his expandable baton to carry out his suicide plan by attacking the officers and forcing them to shoot him. Because Tahah was unable to find the baton, however, he drove off. After the Hummer eventually stopped again, Tahah exited and a foot chase ensued. According to Tahah, he tried to act like he was carrying a gun so the police would shoot him. Instead, he was tackled and arrested.

After he was arrested, Tahah informed Sgt. Hilferty of the Colorado State Patrol that he was a murder suspect in Dodge City and that he wanted to talk. According to Hilferty's trial testimony, Tahah stated that he murdered his ex-girlfriend the previous Friday with a .270 Winchester. Tahah then produced a written confession to that effect.

Once KBI agent Kendrick was notified Tahah was in custody, he drove to Colorado and interviewed Tahah for the third time. In this videotaped interview, Tahah stated that he had lain in wait in Jones' backyard and had aimed his rifle at her house. He stated that the rifle discharged when he was lowering it.

At trial, however, Tahah testified that his confessions to the Colorado and Kansas authorities were untrue. He denied being present at Jones' house that night and stated that he confessed merely to give Jones' family closure.

The jury found Tahah guilty of felony murder and criminal discharge of a firearm. The district court sentenced him to a hard 20 for the felony-murder conviction that was to run consecutive to the 102 months for the underlying felony of criminal discharge of a firearm conviction.

Additional facts will be added as necessary to the discussion below.

ANALYSIS

Issue 1: *The district court erred in not including a lesser included offense instruction to felony murder.*

Tahah argues that the district court erred by denying his requests for a lesser included offense instruction on second-degree unintentional murder and involuntary manslaughter.

*Standard of Review*

K.S.A. 22-3414(3) directs courts to issue lesser included offense instructions "where there is some evidence which would reasonably justify a conviction of some lesser included crime." Historically, however, felony-murder cases have not followed the statutory rule but have been analyzed under a court-created rule commonly known as the "felony-murder rule." See, *e.g.*, *State v. Hoffman*, 288 Kan. 100, Syl. ¶ 4, 200 P.3d 1254 (2009) ("When a murder is committed during the commission of a felony, the rule requiring instructions on lesser included offenses does not apply."). Instead of simply determining whether the evidence would reasonably justify a conviction of a lesser included crime, the felony-murder rule required district courts to determine whether the evidence of the underlying felony was strong or weak. In *State v. Berry*, 292 Kan. 493, 254 P.3d 1276 (2011), we revisited this rule.

In *Berry*, we thoroughly reviewed the history of the felony-murder rule in Kansas. We ultimately recognized that K.S.A. 22-3414(3) makes no exception for felony murder and concluded that it applies as written to felony-murder cases. 292 Kan. at 503, 513. We further concluded that *Berry*'s holding applied to all pending felony-murder cases. 292 Kan. at 514. Because Tahah's case is pending on direct review, we apply K.S.A. 22-3414(3) as written to his argument.

*Discussion*

At trial, Tahah's written and videotaped confessions from May 11 were admitted into evidence. In Tahah's videotaped confession with Kendrick, he admitted that he aimed the rifle at Jones' bedroom door window but as he lowered the rifle "a round went off." In Tahah's written confession given to Sergeant Hilferty, Tahah wrote: "As I was going to put down the front end of the rifle the rifle went off." He also wrote, "I didn't want to kill her."

The State disputed Tahah's characterization of his weapon's discharge. The State proffered testimony from a variety of law enforcement officers that an officer is trained to keep his or her finger off the trigger until ready to fire. It argued that because Tahah was a police officer, the evidence showed that the weapon was intentionally fired.

At the instructions conference, Tahah argued for two lesser included offenses of first-degree murder: second-degree unintentional murder and involuntary manslaughter. The district court understandably applied the felony-murder rule then in effect and denied Tahah's request after finding that evidence of the underlying felony was neither weak nor inconclusive.

As we currently apply K.S.A. 22-3414(3) per our holding in *Berry*, however, we conclude the trial evidence, particularly those parts of Tahah's confessions regarding his lack of intent to discharge the rifle, could reasonably support a conviction for both lesser included offenses. See K.S.A. 21-3402(b) (second-degree unintentional murder is "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life"); K.S.A. 21-3404(a) ("Involuntary manslaughter is the unintentional killing of a human being committed recklessly."). We reach this conclusion after viewing the evidence, as we must, in the light most favorable to Tahah. See *State v. Houston*, 289 Kan. 252, 274, 213 P.3d 728 (2009) ("In determining whether the defendant is entitled to instructions on his or her lesser included offense claim, the evidence must be viewed in the light most favorable to the defendant.").

Consequently, we reverse Tahah's felony-murder conviction and remand for a new trial. We consider Tahah's additional issues only to provide guidance to the district court in the event the same issues resurface. See *State v. Kunellis*, 276 Kan. 461, 78 P.3d 776 (2003).

Issue 2: *The district court appropriately excluded third-party evidence.*

On the night before Jones died, she exchanged numerous text messages with a third party—Elvin Mims. Tahah attempted to in-

troduce these messages into evidence by alleging that they showed Jones was reluctant to meet with Mims alone. Tahah argued that the messages were relevant and admissible as third-party evidence because they showed motive and a temporal link between Mims and Jones. Tahah now claims the district court erred in excluding the messages from evidence after finding they failed to establish any motive or to connect Mims with the shooting.

*Standard of Review*

We stated our standard for reviewing this issue in *State v. Brown*, 285 Kan. 261, 303,173 P.3d 612 (2007):

"A trial court's decision under the third-party evidence rule at the heart of an evidentiary question before us here is subject to an abuse of discretion standard of review on appeal. [Citation omitted.] This standard of review places the burden of proof on appeal on the party alleging that such an abuse of discretion occurred. [Citation omitted.]"

We recently held that "[a] number of considerations comprise this standard, including review to determine that the discretion was not guided by erroneous legal conclusions." *State v. Bricker*, 292 Kan. 239, 244, 252 P.3d 118 (2011) (citing *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 [2010]; *State v. Skolaut*, 286 Kan. 219, Syl. ¶ 3, 182 P.3d 1231 [2008]).

*Discussion*

The admissibility of third-party evidence is evaluated under the "totality of facts and circumstances in a given case." *State v. Adams*, 280 Kan. 494, 505, 124 P.3d 19 (2005); *State v. Marsh*, 278 Kan. 520, 531, 102 P.3d 445 (2004), *rev'd on other grounds Kansas v. Marsh*, 548 U.S. 163, 164 L. Ed. 2d 429, 126 S. Ct. 2516 (2006). To be admissible, third-party evidence must "effectively connect the third party to the crime charged." *State v. Adams*, 280 Kan. at 505. Additionally, third-party evidence must reveal more than motive to be relevant. *Brown*, 285 Kan. at 303.

In *Marsh*, we held that "while evidence of the motive of a third party to commit the crime, standing alone, is not relevant, such evidence may be relevant if there is other evidence connecting the third party to the crime." 278 Kan. at 531. We explained that evi-

dence of third-party motive alone, without connection to the crime charged, serves only to " 'confuse the jury [and] to permit [jurors] to indulge in speculations on collateral matters wholly devoid of probative value relative to who committed the [crime].' " *Marsh,* 278 Kan. at 530-31. In *Marsh,* we held the third-party evidence was admissible because defendant's claims not only showed motive but there was also was direct evidence that the third-party's blood as well as the blood of a victim appeared on the defendant's shoes. But see *Brown,* 285 Kan. at 305 (Third-party evidence inadmissible because defendant's claims were "baseless innuendo" with no connection to the crime charged.).

We conclude that under the totality of facts and circumstances in this case, the text messages neither indicate Mims' motive to commit the crimes nor otherwise connect him to the murder. The district court reviewed the messages and stated that they were indicative of two people "trying to feel their way into a new relationship." The court did not abuse its discretion by excluding this evidence.

Issue 3: *The prosecutor misattributed the source of evidence during closing argument.*

Tahah argues that the prosecutor's misconduct during closing argument violated his right to a fair trial. He argues that the prosecutor intentionally misstated the evidence when he informed the jury that the forensic pathologist told detectives the autopsy results proved Jones was killed by a "high powered" rifle. Tahah further alleges that the pathologist never testified that the bullet "had gone through the glass" as the prosecutor claimed. These alleged errors occurred during the following argument:

"The pathologist, forensic pathologist told you there was no gun powder and all that sort of stuff on [Jones'] body. So that meant there was distance. She's lying clutching a blanket on her left side. There are little fragments on her body right to the head where she was hit. You can look over here at the curtain and there's black something on it. Hole in the door, glass is fallen down. He could tell from the examination it was a bullet wound when they did the autopsy I think the very next day, if not, it was shortly after she was killed. *The doctor then said there's a high powered rifle that committed this. That's why they didn't check the shotguns, didn't check the pistol. The expert said it was a high powered rifle.* It [came] from

a distance. *That round had gone through glass.* That's probably the glass lead peeling off the bullet that's on the curtain." (Emphasis added.)

## Standard of Review

We recently outlined our two-step analysis for prosecutorial misconduct claims in *State v. McCaslin*, 291 Kan. 697, 715, 245 P.3d 1030 (2011):

" 'Allegations of prosecutorial misconduct require a two-step analysis. First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal. *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005) (quoting *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]). We have applied the test to prosecutorial action in contexts beyond mere comment on the evidence. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006) (citing cases).' *State v. White*, 284 Kan. 333, 337-38, 161 P.3d 208 (2007)."

With *Tosh* as our foundation, we have provided specific guidance on the second step of the analysis, *i.e.*, when to grant a new trial because of the misconduct. See, *e.g.*, *McCaslin*, 291 Kan. at 715-16 (harmlessness calculus considers three factors). We acknowledge that this harmless error analysis essentially was recently modified in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011). However, because the case already is being reversed and remanded due to the failure to give lesser included offense jury instructions, we see no valid reason to perform the harmless error analysis, *i.e.*, the second step of reviewing purported prosecutorial misconduct. As a result, we limit our analysis to step one.

## Discussion

We begin our analysis by observing that Dr. George Thomas, a forensic pathologist, performed Jones' autopsy and testified at trial. He testified that Jones was killed by a gunshot wound to the head. When discussing the wound, Dr. Thomas stated that it was atypical because "the bullet is not traveling in a stabilized fashion." According to Dr. Thomas, "[I]f the bullet is disturbed in its pathway the bullet can wobble severely or tumble as it's approaching the

body, and if a bullet travels in this fashion and enters a body we will get what we call [an] atypical gunshot wound of entrance."

The prosecutor asked what the intervening object could have been, but the defendant's "speculation" objection was sustained. Following the objection, the prosecutor stated:

"[Prosecutor]: Doctor, *if the round was fired from a high powered rifle, went through two intervening objects which were glass* before striking the body, do you have any idea how a wound would be inflicted upon a body in that manner compared to this wound?

"[Dr. Thomas]: Well this wound is consistent with that scenario that you described." (Emphasis added.)

Dr. Thomas also testified that glass causes a bullet to wobble and tumble and can cause an atypical gunshot with particles from the bullet also impacting the body. However, Dr. Thomas did not testify as to the caliber of the weapon that had fired the bullet or opine that it was a high-powered rifle.

It is fundamental that prosecutors must not argue facts not in evidence. We acknowledge, however, that prosecutors are given wide latitude during closing to argue reasonable inferences based on the evidence adduced at trial. *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000). Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence. *Richmond*, 289 Kan. at 440-41; see *State v. King*, 288 Kan. 333, 352, 204 P.3d 585 (2009).

Here, contrary to Tahah's claim, the prosecutor's closing argument did not clearly attribute the fact of the bullet's having "gone through glass" to Dr. Thomas. Even if so, Dr. Thomas testified that Jones' "wound [was] consistent" with a bullet passing through glass before striking her body. Accordingly, such an attribution to Dr. Thomas could be a reasonable inference based upon the evidence.

More important, evidence from law enforcement witnesses indicated that the bullet travelled through the glass window before striking Jones. Additionally, Jones' friend Weber testified she noticed the window in Jones' bedroom door was broken, causing her to call 911. We conclude the prosecutor did not argue facts not

admitted into evidence or make unreasonable inferences from the evidence.

The prosecutor did misstate the facts, however, when he argued to the jury that Dr. Thomas, "the expert," himself opined that the murder weapon was a high-powered rifle. This argument was "not supported by the evidence [and was] beyond the wide latitude prosecutors are allowed in commenting on the evidence." *State v. Baker*, 281 Kan. 997, 1012-13, 135 P.3d 1098 (2006). This particular fact was provided instead by KBI agent John Nachtman who testified that "a bolt action high powered rifle with a scope and bipod" was seized from Tahah's apartment, more particularly, a "Winchester model 70, .270 caliber rifle." Moreover, in each of Tahah's three statements to law enforcement, he admitted the seized .270 Winchester was his weapon that discharged in Jones' backyard early in the morning of May 5. This misattribution to Dr. Thomas should not be repeated on remand.

*Issue 4: Tahah did not preserve for appeal the issue of whether the district court erred in admitting evidence under K.S.A. 60-455.*

Tahah contends the district court erred in admitting into evidence the April 13 event where he entered Jones' house through the garage. The State filed a pretrial motion seeking to admit this evidence under K.S.A. 60-455. It argued that the event had a drastic impact on the relationship between Jones and Tahah, and that it gave Tahah motive to kill Jones several weeks later on May 5. In addition to motive, the State sought admission to prove intent and Jones' state of mind. Tahah opposed the motion. After holding a hearing, the court eventually issued an order permitting the event to be used for motive and intent purposes under K.S.A. 60-455.

At trial, the State introduced evidence of the event through Tahah's videotaped confession plus the testimony of Weber and KBI Agent LaRue. The confession included Tahah's version of the event and his reason for going to Jones' house. LaRue testified as to what Tahah disclosed during the initial interviews with law enforcement about the event, and Weber testified to the emotional and psychological effect it had on Jones.

*Standard of Review*

Several analytical steps are required to determine whether evidence was properly admitted under K.S.A. 60-455, the statute concerning the admissibility of a person's other crimes and civil wrongs. See, *e.g.*, *State v. Richmond*, 289 Kan. 419, Syl. ¶ 6, 212 P.3d 165 (2009).

*Discussion*

We need not engage in this multistep analysis, however. Although Tahah opposed the pretrial motion, he failed to object to the introduction of any of the evidence about the event at trial except to lodge one "asked and answered" objection during Weber's direct examination. Accordingly, he failed to preserve the issue for appeal. See *State v. Houston*, 289 Kan. 252, 270, 213 P.3d 728 (2009) (after defendant's pretrial motion to suppress evidence was denied, he failed to object at time it was offered into evidence at trial; court held issue not preserved for appeal); *State v. Richmond*, 289 Kan. 419, Syl. ¶ 4 ("A defendant cannot object to the introduction of evidence on one ground at trial then assert another ground on appeal.").

Issue 5: *Tahah did not preserve for appeal the issue of whether the district court erred in admitting his confession.*

Tahah finally claims that his confession during his May 11 interview was involuntary and therefore improperly admitted into evidence.

The State filed a pretrial motion to admit various pieces of evidence and requested that the court rule on the admissibility of Tahah's statements at all three interviews: May 5, 7, and 11. The State alleged: "Defendant made the statements [in the three interviews] consciously, knowingly, and voluntarily; and he, at the time, was not under any compulsion or coercion, or threats of compulsion or coercion, or acting upon any promise or promises."

In Tahah's response he did not discuss the voluntariness of his confessions, nor did he move to have them suppressed. After a hearing, the court ultimately ruled that all of Tahah's statements

during law enforcement interviews, including his confessions, were voluntary and admissible based on a totality of the circumstances.

*Standard of Review*

When reviewing a challenge to the admission of a defendant's confession the appellate court reviews " 'the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard.' " *State v. Sharp,* 289 Kan. 72, 80, 210 P.3d 590 (2009) (quoting *State v. Harris,* 284 Kan. 560, 579, 162 P.3d 28 [2007]).

*Discussion*

We need not engage in this multistep analysis, however. Although Tahah opposed the pretrial motion, he did not challenge the voluntariness of his confessions. Moreover, he failed to object to the introduction of his confessions into evidence at trial. Accordingly, he failed to preserve the issue for appeal. See *State v. Stevens,* 285 Kan. 307, 326-27, 172 P.3d 570 (2007) (the defendant's challenge to the admission of his confession on appeal was not preserved because he never moved to suppress his statements and did not object to their admission at trial). Even if we characterize Tahah's response to the State's pretrial motion as an effective objection to the voluntariness of his confessions, his failure to then object at the time they were offered into evidence at trial is fatal. See *State v. Houston,* 289 Kan. at 270 (after defendant's pretrial motion to suppress evidence was denied, he failed to object at time it was offered into evidence at trial; court held issue not preserved for appeal).

Reversed and remanded for a new trial.

\* \* \*

ROSEN, J., dissenting: I respectfully dissent from the majority opinion, which concludes that a jury could have reasonably convicted Tahah of second-degree reckless murder or involuntary manslaughter. K.S.A. 22-3414(3) and *State v. Berry,* 292 Kan. 493, Syl. ¶ 6, 254 P.3d 1276 (2011), provide that "[i]nstructions on the lesser degrees of homicide are proper in felony-murder cases when there is some evidence reasonably justifying a conviction of some

lesser included crime beyond a reasonable doubt." Even viewing the evidence in the light most favorable to Tahah, I cannot agree that the evidence would support a conviction of either lesser included crime requested.

This was never a case of an accidental shooting. Tahah was a trained law enforcement officer with the Dodge City Police Department. On the night of the shooting, he declined to assist with the department's response to the Greensburg tornado because he had been drinking. He continued drinking with friends at several bars. At one bar, Tahah was upset by the sight of his ex-girlfriend, Erin Jones, dancing with another man. After drinking into the early morning hours, Tahah drove past Jones' house before returning to his apartment where he changed into dark clothing and dark shoes. Tahah then returned to Jones' residence and lay in wait, hidden in Jones' backyard and armed with his rifle, before firing the shot that killed her. The dark clothing and shoes were later recovered from his trash by officers searching his apartment. Officers also seized a Winchester .270 rifle and three "Winchester Short Mag" .270 shell casings.

The majority relies on Tahah's later-recanted statement to police that the rifle discharged when he was lowering it as sufficient evidence to lead a jury to conclude that the shooting was accidental. Tahah's statement was internally inconsistent with the suggestion that his gun fired accidently. While Tahah said he changed his mind and "when I was lowering the gun a round went off," he later said "[a]fter I made the shot," language that is used when a person intentionally fires a gun. Tahah also made a noticeable trigger-action hand gesture when he talked about firing the rifle. The State presented evidence that trained law enforcement officers are taught to keep their trigger finger off the trigger until ready to fire, and Tahah acknowledged that he had been trained to use that precaution. The State also presented testimony that the angle of the shot was inconsistent with a shot fired while the rifle was being lowered. Tahah provided details of his location in the yard and corrected officers who suggested the shot was fired from inside the house.

At trial, Tahah took the witness stand and recanted his confession and testified that his statements to law enforcement were untrue. He specifically denied being at Jones' house that night. He explained that the confessions were merely intended to give Jones' family closure after her death. In requesting the lesser included instructions, Tahah appears to claim: I wasn't there and didn't do it; but if I was there, I accidently shot Jones in the head. This assertion defies Aristotelian logic, which holds that contradictory statements cannot coexist as truth. Imagine Lee Harvey Oswald claiming that he was nowhere near the Texas School Book Depository on the day President Kennedy was shot, but even if he was, his rifle went off quite by accident, and besides, he was too absorbed in the excitement of viewing the presidential motorcade through the scope on his rifle to be clear about what was transpiring. One strains to resist feeling insulted by the putting forward of such a logically impossible defense.

Or consider this scenario: a car salesman confesses that he stole a low-mileage, late-model Mercedes-Benz. In his statement to police, he gives explicit details about the Mercedes location and the means by which he stole it. He also states that he believed it to be worth $500. At trial, he not only recants and denies ever being in possession of the Mercedes, the State puts on evidence independent of the confession supporting the theft and of the vehicle's value being at least $35,000. Further, there is testimony that the defendant sold one just like it a month prior for $40,000. The majority would find that it was reversible error for the trial court not to instruct on the lesser included crime of misdemeanor theft. The law has never been that simply saying something in a statement, especially when it is later repudiated by the declarant and unsubstantiated by any evidence, suffices to validate it as "some evidence reasonably justifying a conviction of some lesser crime beyond a reasonable doubt." In *State v. Calderon*, 270 Kan. 241, 255-56, 13 P.3d 871 (2000), the defendant requested an instruction on reckless second-degree murder as a lesser included offense of first-degree murder based on the defendant's testimony that he intended to cut the victim's arm but accidently stabbed the victim in the abdomen. As we noted in that case:

" ' "We have held that a criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense." ' " *Calderon*, 270 Kan. at 256 (quoting *State v. Moncla*, 262 Kan. 58, 73-74, 936 P.2d 727 [1997]).

In *Calderon*, this court reviewed the record and concluded that the evidence did not support an instruction for reckless second-degree murder. We noted that there was overwhelming evidence of intent and Calderon's self-serving statement regarding his lack of intent did not in itself support the lesser included instructions based on recklessness. *Calderon*, 270 Kan. at 256. The evidence presented in this case demonstrates that Tahah dressed in dark clothing, lay in wait in his ex-girlfriend's backyard, and intentionally shot and killed her with his Winchester .270 rifle. The only suggestion that his actions were unintentional was disavowed by Tahah himself and thoroughly and convincingly nullified by the evidence produced at trial.

Second-degree reckless murder is the killing of a human being committed unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life, K.S.A. 21-3402(b); and involuntary manslaughter is the unintentional killing of a human being committed recklessly, K.S.A. 21-3404(a). Here, there was no evidence presented at trial that could reasonably justify a conviction that Tahah unintentionally but recklessly discharged his rifle at an occupied dwelling. Based on the evidence presented and consistent with his theory of defense before the jury, Tahah either committed the act and was guilty of felony murder as charged or he was guilty of nothing at all.

Second-degree reckless murder and involuntary manslaughter may now be lesser included offenses of felony murder in some situations in which they were not previous to *Berry*. However, in this case there was no evidence, when viewed in the light most favorable to Tahah, on which a reasonable jury could convict Tahah of either of the requested lesser included instructions beyond a reasonable doubt. "Where there is no substantial testimony applicable to the lesser degrees of the offense charged and all of the

evidence taken together shows that the offense, if committed, was clearly of the higher degree, instructions relating to the lesser degrees of the offense are not necessary." *State v. Shortey*, 256 Kan. 166, Syl. ¶ 2, 884 P.2d 426 (1994).

Accordingly, I conclude it was not error to deny Tahah's request for second-degree reckless murder and involuntary manslaughter as lesser included offenses of felony murder.