IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 109,857

STATE OF KANSAS,
*Appellee*,

v.

CHRISTOPHER TAHAH,
*Appellant*.

SYLLABUS BY THE COURT

1.

Pursuant to K.S.A. 2014 Supp. 21-5402(d) and (e), lesser included offense instructions for felony murder are not legally appropriate.

2.

In determining whether a prosecutor erred during closing argument, an appellate court first decides whether the comments were outside the wide latitude a prosecutor is allowed in discussing the evidence. While a prosecutor may not make inflammatory statements to the jury, he or she may use graphic speech to refer to the facts disclosed by the evidence.

3.

While ultimate credibility determinations must be left to the jury, a prosecutor may draw reasonable inferences from the evidence and may argue that certain testimony is not believable.

1

4.

A defendant has the right to assert factually inconsistent defenses at trial. A prosecutor's statement that a defendant "cannot have it both ways" in direct reference to a defendant's factually inconsistent defenses is a misstatement of the law and is error. A prosecutor's misstatement of the law is subject to a harmless error analysis in which the court considers whether: (1) the error was gross and flagrant, (2) the error showed ill will on the prosecutor's part, and (3) the evidence was so overwhelming that the error would have had little weight in the jurors' minds.

5.

A district court's preliminary instructions to the jury are reviewed for clear error if no contemporaneous objection was made.

6.

In a criminal case, it is not error for a district court to provide a preliminary instruction to jurors informing them that a mistrial due to juror misconduct would result in a tremendous expense and inconvenience to the parties, the court, and the taxpayers.

Appeal from Ford District Court; E. LEIGH HOOD, judge. Opinion filed October 2, 2015. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause, and *Lydia Krebs*, of the same office, was on the brief for appellant.

*Natalie K. Randall*, county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Following our reversal of the convictions in his first trial, Christopher Tahah was once again tried and convicted of felony murder and the underlying felony of criminal discharge of a firearm at an occupied dwelling. Tahah has now filed another direct appeal, raising four issues: (1) The district court erred in failing to give lesser included offense instructions to the felony-murder charge; (2) prosecutorial misconduct deprived him of a fair trial; (3) judicial misconduct deprived him of a fair trial; and (4) his constitutional rights were violated because he was subjected to an increased sentence based on a criminal history finding that was not decided by a jury beyond a reasonable doubt. Finding no reversible error, we affirm Tahah's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

The facts arising from the second trial are not in dispute and do not deviate substantially from the recitation contained in our earlier opinion. See *State v. Tahah*, 293 Kan. 267, 262 P.3d 1045 (2011) (*Tahah I*). In sum, Tahah, a Dodge City police officer, began dating the victim, Erin Jones, in January 2007. The relationship quickly became serious. However, in April, Jones abruptly broke it off. Tahah did not respond well.

On May 4, 2007, Tahah observed Jones dancing with another man at a bar. The next day, Jones was found in her bedroom, dead from a single gunshot wound to the head. After Jones' body was discovered, Sergeant Slickers of the Dodge City Police Department went to Tahah's apartment accompanied by KBI Agents Jason LaRue and Mark Kendrick. The KBI officials seized Tahah's service weapon and then conducted the first of three interviews, during which they informed Tahah that Jones was dead. Tahah appeared to be upset by the news. Agent LaRue testified that during the interview Tahah said that he had considered revenge on Jones but did not act on those feelings.

3

KBI officials secured a search warrant for Tahah's apartment and thereafter conducted searches on May 6 and May 11, during which they seized inculpatory items such as a Winchester .270 rifle, shell casings, and dark clothing.

On May 7, Tahah again spoke with KBI agents, but then he left town, driving to Denver, Colorado. Tahah would testify that he contemplated suicide multiple times while in Denver. On May 11, Tahah attempted to return to Dodge City in a stolen vehicle but was apprehended by Colorado law enforcement officers. Tahah confessed to a Colorado State Patrol sergeant that he murdered his ex-girlfriend the previous Friday with a .270 Winchester. Tahah then produced a written confession to that effect.

KBI Agent Kendrick drove to Colorado and interviewed Tahah for the third time. In this videotaped interview, Tahah gave an explicit, detailed confession in which he confessed that after seeing Jones dance with another man, Tahah changed into dark clothing, retrieved his loaded Winchester .270 rifle, and went to Jones' house to lay in wait until he believed Jones was home alone. Tahah said he first considered breaking into Jones' bedroom, which had an access door to the backyard. Tahah abandoned that plan after noticing the access door also had a storm door, which may have impeded his entry. Tahah then decided that he would fire a shot through both doors' glass windows in order to scare Jones. Tahah claimed that at the last minute he decided his plan was no good, but the rifle accidentally discharged as he lowered it from his aim at Jones' bedroom door. Tahah said that he then ran out of the backyard, got in his car, and returned home.

At trial, however, Tahah testified that his confessions to the Colorado and Kansas authorities were untrue. He admitted driving by Jones' house twice on the night of her murder but denied killing her. When asked why he would admit to something he did not do, Tahah said that he wanted to give Jones' family closure in case he was killed while in prison.

4

At the conclusion of the trial, the jury was instructed on felony murder—as well as second-degree reckless murder and involuntary manslaughter as lesser included offenses. The jury convicted Tahah on the charges of felony murder and criminal discharge of a firearm at an occupied building.

LESSER INCLUDED OFFENSE INSTRUCTIONS

Tahah argues the district court erred in refusing to give his requested instruction for voluntary manslaughter. In addition, he claims that the district court should have also instructed the jury on intentional second-degree murder, even though no request for that instruction was made.

*Standard of Review*

Although we undertake a different analysis depending on whether a party has requested a jury instruction, we always determine whether the instruction was legally appropriate before making any finding of error. *State v. Smyser*, 297 Kan. 199, 203-04, 299 P.3d 309 (2013).

*Analysis*

At the time of Tahah's first trial, Kansas applied a judicially created lesser included offense rule in felony-murder cases. This rule provided that lesser included offense instructions were necessary only when evidence of the underlying felony was weak, inconclusive, or conflicting. See *State v. Boone*, 277 Kan. 208, 219, 83 P.3d 195 (2004) (quoting *State v. Branning*, 271 Kan. 877, 887, 26 P.3d 673 [2001]). Then, in *State v. Berry*, 292 Kan. 493, 513, 254 P.3d 1276 (2011), we held that the statutory mandate in K.S.A. 22-3414(3) governed the use of lesser included offense instructions in

5

felony-murder cases. Indeed, relying on *Berry*, we reversed Tahah's first conviction for felony murder because the district court failed to give lesser included offense instructions. *Tahah I*, 293 Kan. at 273.

Following *Tahah I*, the legislature amended the criminal code to provide that felony murder has no lesser included offenses. See K.S.A. 2012 Supp. 21-5109. In *State v. Wells*, 297 Kan. 741, 761, 305 P.3d 568 (2013), we held that the statutory amendment did not apply retroactively. Tahah now relies on *Wells* to claim that he was legally entitled to the lesser included offense instructions. But after *Wells*, the legislature again amended the law to make the elimination of lesser included offenses for felony murder retroactive. L. 2013, ch. 96, sec. 2. At oral argument, Tahah's counsel argued that the legislative amendments to K.S.A. 21-5402 violate the Ex Post Facto Clause of the United States Constitution. However, we previously addressed and rejected this argument in *State v. Todd*, 299 Kan. 263, 279, 323 P.3d 829 (2014).

Tahah has not presented any new or persuasive argument compelling us to overturn *Todd*. Therefore, pursuant to our precedent, we find that lesser included offense instructions for felony murder are not legally appropriate. As such, the district court did not err in failing to give the additional lesser included offense instructions that Tahah now claims the jury should have received.

PROSECUTORIAL MISCONDUCT

Tahah next claims that the prosecutor committed three instances of misconduct during the trial: (1) an opening statement reference to Tahah "going hunting" for Jones; (2) a closing argument reference to Tahah's "way of thinking;" and (3) closing argument comments that Tahah "cannot have it both ways." Although we find that the prosecutor

6

misstated the law by arguing that Tahah "cannot have it both ways," we find that the misstatement is harmless.

*Standard of Review*

A claim of prosecutorial misconduct based on comments made during voir dire, opening statements, or closing arguments is reviewable on appeal even absent a contemporaneous objection. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). Such review involves a two-step process. *State v. Brown*, 298 Kan. 1040, 1050, 318 P.3d 1005 (2014). First, we decide whether the comments were outside the wide latitude that a prosecutor is permitted in discussing the evidence. 298 Kan. at 1050. Second, if the comments were improper and therefore error, we then decide whether the comments prejudiced the jury against the defendant and deprived the defendant of a fair trial. 298 Kan. at 1050. Under the second step, we consider three factors:  (1) whether the error was gross and flagrant; (2) whether the error was motivated by ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the error would have had little weight in the mind of a juror. 298 Kan. at 1050. In conducting this analysis, the standard of constitutional harmlessness must be met to avoid a finding of reversible error. 298 Kan. at 1050-51; see also *State v. Bridges*, 297 Kan. 989, 1012-13, 306 P.3d 244 (2013) (once the State meets the higher constitutional harmless error standard, the lower statutory standard in K.S.A. 60-261 is necessarily met).

*Analysis*

1.     *"Going hunting"*

During opening statements, in the context of previewing Tahah's videotaped confession, the prosecutor explained that Tahah admitted that he went home after seeing

Jones at Central Station; he changed into dark clothes; and he went to Jones' house. The prosecutor then said:

> "But what he was really doing was going hunting for Erin, because he took along his .270 rifle, but not before he took three live shells, cartridges. And, the magazine of this .270 rifle holds three shells. It's a built-in magazine, so you have to open the bolt. You have to force the cartridges into a spring loaded magazine, and then you close the bolt."

The prosecutor went on to describe how Tahah "sneaked down the alley" and "secluded himself on the north side of the house with his dark clothing and his .270 rifle loaded, and waited for [Jones] to come home."

"'[A] prosecutor is allowed considerable latitude in discussing the evidence and drawing reasonable inferences from that evidence.'" *State v. Crawford*, 300 Kan. 740, 749, 334 P.3d 311 (2014) (quoting *State v. McCaslin*, 291 Kan. 697, 722, 245 P.3d 1030 [2011], *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 [2014]). We find that the prosecutor's comments constitute a reasonable inference from the evidence admitted through Tahah's videotaped confession. Tahah admitted that after seeing Jones at a bar dancing with another man, he returned home and changed into dark clothing, retrieved his loaded rifle, went to Jones' house, hid outside, and waited for her to come home before sneaking into her backyard and firing the weapon into her bedroom. The prosecutor's characterization of these actions as hunting is reasonable. A prosecutor may use picturesque speech so long as he or she refers to facts disclosed by the evidence. *Crawford*, 300 Kan. at 749.

Further, even though the State did not need to prove Tahah intended to kill, *i.e.*, "hunted for" Jones to sustain a conviction for the charged crime of felony murder, the State did need to prove that Tahah maliciously and intentionally discharged a firearm into

8

an occupied building without authorization in order to establish the underlying felony of criminal discharge of a firearm at an occupied building. See K.S.A. 21-4219(b). Therefore, discussion of this evidence was relevant to the State's case. See *State v. Story*, 300 Kan. 702, 713, 334 P.3d 297 (2014) (A prosecutor may use analogies or rhetoric in an attempt to bring order to the facts presented at trial and place them in meaningful context.). Although Tahah's videotaped confession indicated that he accidentally discharged the rifle, the prosecutor's characterization of the other statements contained in his confession was relevant to show that Tahah did not accidentally discharge the rifle; but instead, he intentionally and maliciously fired it into Jones' bedroom. We therefore conclude that the prosecutor's reference to "going hunting" was not error.

2. *"Way of thinking"*

During the rebuttal portion of his closing argument, the prosecutor, in discrediting Tahah's trial testimony that he gave a false confession, said:

"One of the first things the Defendant said on the witness stand last Friday: I want to tell you I am not responsible for Erin's murder. I[s] i[t] reasonable to conclude that *in his way of thinking*, he is not responsible? In his way of thinking, she, Erin, has to take the responsibility for her murder. If Erin would have just loved him, she would be alive. If Erin had not rejected him, she would still be alive. If Erin would have allowed him to be her guy, instead of dancing and making plans to date Jason Carpenter, she would still be alive. It is her fault she is dead. He is not responsible for her actions which led down the path of his revenge." (Emphasis added.)

Tahah argues that the prosecutor's statement constitutes a mischaracterization of the evidence because Tahah "never said these things or even implied them. Thus, the prosecutor went outside the wide latitude allowed in suggesting this was Mr. Tahah's 'way of thinking.'"

9

The prosecutor's comments were given as an alternative explanation for Tahah's decision to recant his original confession, *i.e.*, he had convinced himself that he was not "responsible" for Jones' murder. "[W]hen a case turns on conflicting stories, it is proper for a prosecutor to assert reasonable inferences based on the evidence and to argue that certain testimony is not believable, but the jury must be left to draw ultimate credibility determinations." *State v. Holt*, 300 Kan. 985, 1002-03, 336 P.3d 312 (2014).

Moreover, the prosecutor's inference was reasonable and supported by the evidence of record. During his videotaped confession, Tahah admitted that on the night of the murder, he was upset after seeing Jones dance with another man. Tahah also said that he wanted to scare Jones because she had hurt him by breaking off their relationship. KBI Agent LaRue testified that Tahah admitted to thoughts of revenge against Jones. The evidence supported a finding that Tahah's "way of thinking" was to exact revenge on Jones for breaking up with him. As such, the prosecutor properly inferred that Tahah recanted his confession because, in his mind, he was not responsible for Jones' murder, *i.e.*, that she deserved what happened to her because she hurt him. We conclude that the prosecutor's statement was not error because it was a reasonable inference drawn from the evidence.

3.      *"Cannot have it both ways"*

The jury was first instructed on first-degree felony murder. The jury was then instructed that if it did not agree that Tahah was guilty of first-degree murder, then it should consider the lesser included offense of murder in the second degree, which was defined as the unintentional but reckless killing of Jones. During closing arguments, the prosecutor stated:

10

"[PROSECUTOR]: *There are some lesser included instructions that the Court gave you.*

"Aristotle, the great philosopher, wrote extensively on logic. He concluded that two contradictory statements cannot coexist in the truth. In a layman's terms, you cannot have it both ways. The Defendant cannot claim, on one hand, he was not there and did not pull the trigger and kill Erin Jones, at that same time claim that if he was there, it was unintentional and reckless.

"[DEFENSE COUNSEL]: Your Honor, I'm gonna object. That mischaracterizes what the law is.

"THE COURT: Overruled.

"[DEFENSE COUNSEL]: You've already given lesser includeds at this point.

"THE COURT: Sustained. Move back to the evidence, Mr. Malone.

"[PROSECUTOR]: An example would be J.F.K.'s assassination. Lee Harvey Oswald, like him saying I was not there on the sixth floor of the depository, of the Texas book depository, and did not pull the trigger. But, if I was, it was all just accidental or reckless, not intentional.

"The true verdict that the State is asking you to render is one of guilty on criminal discharge of a weapon and guilty on the felony murder of Erin Jones. Thank you." (Emphasis added.)

Tahah argues that the prosecutor's statements constitute a misstatement of law and fact. With regard to the law, Tahah claims that a defendant is entitled to present more than one theory of defense, even if the theories are inconsistent. The State contends that the prosecutor was not making a legal statement about the jury instructions but rather arguing that the jury could only believe one of Tahah's stories.

While the prosecutor's comment referenced the lesser included offenses (which we held above were not legally appropriate and therefore not legally available to Tahah), the thrust of the prosecutor's argument to the jury attacked Tahah's factual defense—*i.e.*, the claim that "he wasn't there" but that if he was there, the shooting was "unintentional and reckless." Despite the fact that Tahah was not legally entitled to any lesser included

11

instructions on the felony murder charge, he remained legally entitled to offer factually inconsistent defenses to the jury. *State v. Sappington*, 285 Kan. 158, 164, 169 P.3d 1096 (2007) ("the general rule in criminal cases is that even inconsistent defenses are generally permissible"). Thus, the prosecutor's statement that Tahah "cannot have it both ways," in the context of discussing Tahah's factually inconsistent defenses is a misstatement of the law and therefore constitutes error. See *State v. Akins*, 298 Kan. 592, 606, 315 P.3d 868 (2014) (prosecutor's misstatement of law constitutes misconduct).

Turning to the second step, we first consider whether the misconduct was gross and flagrant. In making this determination, we take into account "whether the misconduct was repeated, was emphasized, violated a long-standing rule, violated a clear and unequivocal rule, or violated a rule designed to protect a constitutional right." *State v. Marshall*, 294 Kan. 850, Syl. ¶ 6, 281 P.3d 1112 (2012). Here, the prosecutor's statements regarding contradictory statements occurred at the very end of closing argument and were not repeated or emphasized. We find the misconduct was not gross and flagrant, and this first factor weighs against a finding of prejudice. However, because the prosecutor continued with his improper argument after the district court directed him to return to the evidence, we find that the prosecutor's misconduct was motivated by ill will. See *Marshall*, 294 Kan. 850, Syl. ¶ 7 (prosecutor's misconduct may be motivated by ill will where it was deliberate, repeated, or in apparent indifference to court's ruling). As such, the second factor weighs in favor of a finding of prejudice.

Lastly, we find that the third factor weighs against reversal because any prejudicial effect of the prosecutor's misconduct is substantially outweighed by the direct and overwhelming evidence against Tahah. Therefore, when the prosecutor's statements are considered in light of the record as a whole, we conclude that there is no reasonable possibility that the misconduct contributed to the verdict. See *Bridges*, 297 Kan. at 1012-13.

12

At the beginning of the trial, the district court provided several preliminary instructions to the newly impaneled jury. Tahah claims that the district court committed judicial misconduct while giving the instruction that warned the jury against considering any information outside of the evidence presented at trial. The district court told the jurors that consideration of outside information could result in a mistrial, which "is a tremendous expense and inconvenience to the parties, the Court and the tax payers." Tahah argues this statement violates *State v. Salts*, 288 Kan. 263, 266, 200 P.3d 464 (2009), where we held that an instruction informing jurors that "'another trial would be a burden on both sides,'" was misleading and inaccurate and therefore error.

*Standard of Review*

Tahah characterizes this issue as judicial misconduct, rather than instructional error, and argues that it is subject to de novo review on appeal, despite his lack of a contemporaneous objection. However, judicial misconduct claims do not typically encompass a judge's instructions to the jury. See *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010) (An appellate court must review the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct.). Further, the district court's verbatim recitation of PIK Civ. 4th 101.12, the instruction for impaneled jurors in civil cases, establishes that the issue should be reviewed as instructional error.

Tahah concedes that he failed to raise this issue below. Generally, issues not raised before the trial court cannot be raised on appeal. *State v. Johnson*, 293 Kan. 959, 964, 270 P.3d 1135 (2012). When dealing with instructions given at the *close* of the evidence, Kansas statute mandates that we review errors asserted for the first time on appeal for

clear error. See K.S.A. 22-3414(3). There is no parallel statute setting forth our standard of review for claimed errors in a trial court's preliminary instructions.

We have held, however, that the clearly erroneous standard along with its availability as an exception to the contemporaneous objection rule predates its statutory codification. *State v. Williams*, 295 Kan. 506, 510-12, 286 P.3d 195 (2012). Thus, we have always reviewed unpreserved claims of instructional error—regardless of when the alleged error occurred during the trial process—for clear error. *Sams v. Commercial Standard Ins. Co.*, 157 Kan. 278, 287, 139 P.2d 859 (1943) ("[T]he general rule is that where no objection is made to the giving of an instruction during the trial and no request was made for its modification or clarification and such instruction is not clearly erroneous a litigant cannot be heard to complain on appeal."). Finally, the clear error standard is in reality a heightened standard of harmlessness. *Williams*, 295 Kan. at 511 (clear error standard "more akin to stating a harmless error test than a standard of review"). Thus, we must first determine whether the claimed error in the preliminary instructions was legally and factually appropriate.

*Analysis*

In *Salts*, the district court provided the following oral and written jury instruction, without objection, before deliberations began:

> "'Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge(s) to a different jury at a later time. *Another trial would be a burden on both sides.*'" 288 Kan. at 264.

Salts appealed, and this court held that the language, "'another trial would be a burden on both sides,'" was misleading and inaccurate because a second trial would not

14

necessarily be burdensome to both sides and because a jury is not to concern itself with what happens after arriving at a verdict. 288 Kan. at 266-67.

Tahah urges us to expand the holding of *Salts* to apply to preliminary jury instructions as well as to the *Allen* instruction at issue in *Salts* (an *Allen* instruction is any instruction "that encourages the jury to reach a unanimous verdict so as to avoid a mistrial." *United States v. McElhiney*, 275 F.3d 928, 935 [10th Cir. 2001]; see *Allen v. United States*, 164 U.S. 492, 501-02, 17 S. Ct. 154, 41 L. Ed. 528 [1896]). We have a long and justified history of disapproving *Allen*-type jury instructions. In fact, our disapproval of this type of instruction, when given to the jury during deadlocked deliberations, pre-dates *Allen* itself. See *State v. Bybee*, 17 Kan. 462, 466-67, 1877 WL 898 (1877). Likewise, we have carefully scrutinized written *Allen*-type instructions given to the jury at the close of trial. See, e.g., *Salts*, 288 Kan. at 266 (disapproving the language "'[a]nother trial would be a burden on both sides'" in PIK Crim. 3d 68.12); *State v. Scott-Herring*, 284 Kan. 172, 180-81, 159 P.3d 1028 (2007) (approving 2005 modifications to deadlocked jury instruction, PIK Crim. 3d 68.12).

These concerns are well grounded and we do not alter our approach to these instructional questions today. An *Allen* instruction risks coercing a unanimous verdict by unduly influencing jurors to compromise their views on the evidence simply to avoid a hung jury. Because of its coercive character, the *Allen* instruction has rightly been described as factually inaccurate. A new trial due to a hung jury is likely not, in fact, an inconvenience to the defendant—especially when measured against a coerced conviction. See *Salts*, 288 Kan. at 266 ("[A] second trial may be burdensome to some but not all on either side of a criminal case.").

The preliminary jury instruction here, however, is not an *Allen* instruction. Its character and purpose are entirely different. The instruction occurred at the start of trial,

15

before the presentation of evidence, and warned jurors of the dangers of a mistrial resulting from their own misconduct. As such, its coercive effect (to prevent juror misconduct) is entirely proper and justified. Moreover, because its purpose is proper, the instruction is factually accurate. The prospect of a mistrial due to juror misconduct—especially when viewed from the pretrial vantage point of the parties—is, in fact, equally inconvenient and undesirable to both parties. In particular, it interferes with the defendant's right to a speedy resolution of the criminal allegations against him or her. Given this significant distinction, the *Salts* rationale is inapplicable here.

Juror misconduct imposes grave costs not only to the parties and others involved in the trial process, but significantly to the integrity of our jury trial criminal justice system itself, which depends on the honest and ethical behavior of jurors. We do not need to look far to see the ease with which today's smartphone equipped jurors can commit misconduct—perhaps even innocently. See *State v. Prator*, No. 111,103, 2015 WL 1123138, at *5 (Kan. App. 2015) (unpublished opinion) (affirming the denial of motion for mistrial after jurors used internet to look up definitions of words used in jury instructions). In light of these considerations, we hold that the warning against juror misconduct contained in PIK Civ. 4th 101.12 is both legally and factually accurate in the criminal context as well as the civil.

IMPOSITION OF ENHANCED SENTENCE

Lastly, Tahah argues that his rights under the Sixth and Fourteenth Amendments to the United States Constitution were violated because the State did not include his prior convictions in the complaint or prove them to the jury beyond a reasonable doubt when imposing an enhanced sentence. We have conclusively rejected this claim in *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). Tahah has not proffered any argument or

authority as to why we should overrule *Ivory*. As such, we find the imposition of his enhanced sentence was proper.

Tahah's convictions and sentence are affirmed.

* * *

ROSEN, J., concurring:  I join in the majority opinion as to all issues decided in this matter. I write separately only to address any confusion or perceived inconsistency that may result from finding error in the State's use of my dissenting opinion from Tahah's first appeal in the retrial's closing argument. *State v. Tahah*, 293 Kan. 267, 280-84, 262 P.3d 1045 (2011) (Rosen, J., dissenting).

My dissent was meant to express my dismay as to the necessity of lesser included offense instructions pursuant to K.S.A. 22-3414(3), which resulted in reversal of Tahah's first trial. It was not meant to be a blueprint for closing argument in the subsequent proceeding where the legal parameters have been established by this court's remand requiring inclusion of lesser included offenses.

While it has been said that "imitation is the sincerest form of flattery," I want to caution that any such duplication must be carefully considered and placed in the proper context so as to maximize the effectiveness of its use.

* * *

JOHNSON, J., concurring: I agree with the majority's determination that the trial court's orally-delivered preliminary jury instruction was not clearly erroneous. But I reach that conclusion because I am firmly convinced that, if the trial judge had omitted

17

the parts of the pretrial instruction soliloquy that I deem erroneous, it would not have impacted the result of the trial. *Cf. State v. Salts*, 288 Kan. 263, 266-67, 200 P.3d 464 (2009) (although error to instruct jury that "another trial would be a burden on both sides," it was not clearly erroneous in that case).

I cannot, however, accept the majority's declaration that it was legally and factually appropriate to instruct the jury that a mistrial requires the restarting of the entire trial process and that a mistrial is a tremendous expense and inconvenience to all concerned, including taxpayers. The rationale utilized in *Salts* is equally applicable here, *i.e.*, the attempted coercive instruction directs the jurors to consider matters that are beyond the scope of their role in the criminal justice system and the instruction statement is not true in all respects.

Before addressing the majority's reasoning, I pause to describe and quote more extensively from the district court's preliminary instruction. In my view, one must consider the context in which the jury received the challenged instruction language in order to assess its potential impact.

The court began by stating the general proposition that the jury was to decide the case solely on the evidence, applying the court-instructed law to the evidence to obtain a verdict. The court specifically admonished the jury that it was "very important" that "[i]n order for your verdict to be fair, you must not be exposed to any other information about the case, the law or any of the issues involved in this trial during the course of your jury duty." That admonishment was followed by "some very detailed explanations about what [the jurors] should do and not do" while serving as jurors.

Those detailed explanations included prohibiting any attempt to get information from any source outside the courtroom by talking to friends or family, reading any

18

printed or electronic material, using any electronic device to access any outside source, or doing any personal investigation, such as visiting the crime scene or using Google Earth. Further, the judge warned the jurors not to talk to any potential witness or create any reenactments of the events and not to communicate with anyone about the case or their jury service "by using cell phones, e-mails, text messages, tweets, blogs, chat rooms, comments or other posting on Facebook, Myspace, Linkedin, or any other social website." The communication ban also applied to family members, employers, and people involved in the case, except that a juror could inform family members or an employer that he or she had been seated as a juror.

The court acknowledged that its rules and restrictions asked the jurors to refrain from engaging in common and important everyday activities, but it informed the jurors that "the law requires these restrictions to insure the parties have a fair trial based upon the evidence that each party has had an opportunity to produce and discuss." The judge further explained that the reason it was so important that the jury base its verdict only on information that it received in the courtroom was because information obtained from an outside source "might be inaccurate, or incomplete, or for some other reason not applicable to this case," and that the parties would not have a chance to explain or contradict the outside information because they would not know that it exists. That led the court into the language giving rise to this appeal challenge, which is italicized below:

> "You must not engage in any activity or be exposed to any information that might unfairly affect the outcome of this case.
> "Any juror who violates these restrictions I have explained to you jeopardizes the fairness of these proceedings, and a mistrial could result. *That would require the entire trial process to start over. As you can imagine, a mistrial is a tremendous expense and inconvenience to the parties, the Court and the tax payers.*" (Emphasis added.)

19

The court did not end its instructions at that point. It went on to direct the jurors to report any exposure to outside information, any outside contact, or any juror misconduct by others, either to the court or to the bailiff. The court then clarified that its instructions were not merely a pretrial matter, but rather "[t]hese restrictions must remain in effect throughout this trial." Indeed, the court made it clear that what it was saying in its preliminary instruction was to carry through to the end of the trial when it talked about how the jurors should approach deliberations. That part of the preliminary instruction dealing with deliberations culminated with the statement that "[i]f every juror is fair and reasonable, a jury can almost always agree" on a verdict.

Turning back to the majority opinion, it is noteworthy that it acknowledges that a written *Allen*-type instruction given to the jury at the close of trial, such as the one given in *Salts*, presents well grounded concerns. The majority describes those concerns as the risk that the instruction can improperly coerce a unanimous verdict and the fact that the instruction's content "has rightly been described as factually inaccurate." Slip op. at 15. The majority then attempts to distinguish the preliminary instruction given in this case as having a character and purpose that are entirely different. That distinction cannot withstand closer scrutiny.

The majority inexplicably relies on the timing of the instruction to support its different-character contention, stating that "[t]he instruction occurred at the start of trial, before the presentation of evidence." Slip op. at 15-16. Then, in assessing the impact of a mistrial, the majority suggests that it should be "viewed from the pretrial vantage point of the parties." Slip op. at 16. The apparent suggestion being that the preliminary instruction was addressing potential juror misconduct, and the resultant mistrial, that might occur at the beginning of a trial before evidence is presented. But, of course, that is not the case.

20

The district court's explanation of the restrictions on the jurors' conduct encompassed activities that could occur throughout the entire trial, including deliberations. And if the explanations were not obvious enough, the judge specifically told the jurors and the parties that the restrictions on juror conduct "must remain in effect throughout this trial," until after a verdict was delivered. It even lectured the jury on how it should conduct itself during deliberations, notwithstanding the instruction's pretrial vantage point. In short, I fail to see the relevance of the fact that the consequences-of-mistrial instruction was given before commencement of trial when the court made it applicable to the entire trial.

Moreover, frequently, when juror misconduct occurs, or is discovered, it happens or has happened during the jury's deliberations after the close of evidence. See, *e.g.*, *State v. Bell*, No. 111,265, 2015 WL 2414344, at *4-5 (Kan. App. 2015) (unpublished opinion) (after verdict, juror informed court that during deliberations, another juror had said defendant banned from other Wal-Mart stores); *State v. Fulton*, 269 Kan. 835, 838, 9 P.3d 18 (2000) (during deliberations, presiding juror informed court that a juror had introduced outside prejudicial information about defendant's brother to jury); *Saucedo v. Winger*, 252 Kan. 718, 723, 850 P.2d 908 (1993) (during deliberations, juror told of daughter attending school with defendant); *State v. Arney*, 218 Kan. 369, 371, 544 P.2d 334 (1975) (juror introduced results of personal investigation during deliberations, which jury discussed); *Butler v. HCA Health Svcs. of Kansas, Inc.*, 27 Kan. App. 2d 403, 407, 6 P.3d 871, *rev. denied* 268 Kan. 885 (1999) (during deliberations, jury discussed rejected settlement offer, government benefits available to plaintiff, and possible effect of verdict on defendant physicians); *Johnson v. Haupt*, 5 Kan. App. 2d 682, 685, 623 P.2d 537 (1981) (news article introduced into deliberations). Thus, at least the parties' attorneys should not have viewed the district court's consequences-of-mistrial warning as a pretrial matter, and I have to believe that a rational jury would have understood the preliminary

21

instruction as a warning that a mistrial could occur at any time before a verdict was rendered.

The majority declares that the instruction's coercive effect—to prevent juror misconduct—is entirely proper and, therefore, justified. From that end justifies the means mindset, the majority takes a giant leap of logic to conclude that, because the purpose of the instruction is proper, it must be "factually accurate." Slip op. at 16. I disagree on several levels.

The majority's ends-justifies-the-means rationale suggests that the district court's tremendous expense and consequences warning only applied where there was juror misconduct. But the district court stated that the consequences flowed from starting the trial process over. A fair reading of the instruction is that juror misconduct could result in a mistrial; a mistrial is the circumstance where the entire trial process starts over; and starting the trial process over is a tremendous expense and inconvenience to the parties, the court, and the taxpayers. Consequently, a reasonably intelligent juror would understand that when the district court subsequently tells the jury that if every juror is fair and reasonable they should almost always reach an agreement, it is implying that if they do not reach an agreement, the entire trial process will start over and cause a tremendous expense and inconvenience to everyone, including taxpayers. In other words, the warning that a tremendous expense and inconvenience results from a retrial after mistrial applies equally to a hung jury mistrial as it does to a juror misconduct mistrial. The district court did not distinguish the consequences of a juror misconduct mistrial from the consequences of a hung jury mistrial, and neither does the majority. I submit there is no distinction.

Even if one views the consequences-of-mistrial warning as only applicable to a mistrial based on juror misconduct, it was unnecessary and ineffectual for that purpose.

22

The "grave costs" of juror misconduct to which the majority alludes, including damaging "the integrity of our jury trial criminal justice system itself," were adequately addressed by the preliminary instructions that preceded the challenged language. Slip op. at 16. The district court carefully explained the conduct that was improper and laid out specifically why the misconduct would be prejudicial to the parties and would jeopardize the fairness of the proceedings. The court's admonition that juror misconduct "jeopardizes the fairness of these proceedings" is broad enough to encompass the majority's "right to a speedy resolution of the criminal allegations," as well as the alleged consequences-of-mistrial economic hardships. Slip op. at 16. While the court's appeal-to-fairness statements were arguably coercive, they were unquestionably factually and legally appropriate, as well as being consistent with the role the jury is assigned in our criminal justice system, as will be discussed below. Moreover, no further coercion was necessary. If the prospect of being unfair to the parties is not enough to prevent a juror from breaking the judge-stated rules, it is difficult to imagine that the threat of visiting economic hardship upon the parties would shock that juror into submission.

Setting aside the question of whether fairness is an insufficient coercive agent, it is nevertheless incumbent on the court to speak the truth to the jury. Unlike the majority, I would not equate nobility of purpose with factual accuracy. The statement that a mistrial "would require the entire trial process to start over" is a sometimes truth. The State might see that its case has evanesced and decide not to continue the prosecution. A defendant might realize that the evidence is overwhelming and agree to enter a guilty plea. The parties might realize that the case begs for a plea bargain. In all of those scenarios, the entire trial process would terminate, rather than start over.

Likewise, the hyperbolic declaration that a mistrial would be a "tremendous expense and inconvenience" needs further qualification. If the trial does not, in fact, start over, then the mistrial has not caused the parties, the court, or the taxpayers the stated

burden. Furthermore, even if the trial starts over, the indigent defendant with court-appointed counsel will not incur "tremendous expense," at least in short term. More globally, to the extent the judicial branch budget is funded by court filing fees, the taxpayers' skin in the game is de minimis. In short, if we permit the trial court to use a "scared straight" instruction with the jury, the content of the instruction should be completely accurate.

Having quibbled with the majority's rationale, I conclude with the principal reason that the district court erred in giving the consequences-of-mistrial warning. That reason is that the jury should stay focused on its role and not be concerned with what happens after it is discharged. The jury's role in this trial was aptly described by the district court in its Instruction No. 2, given to the jury after the close of evidence, which stated: "Your only concern in this case is determining if the Defendant is guilty or not guilty. The disposition of the case thereafter is a matter for determination by the Court." See also *Shannon v. United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994) ("The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged."). As in *Salts*, the preliminary instruction and Instruction No. 2 sent a mixed message to the jury. 288 Kan. at 266. Moreover, the jurors should not be concerned with the amount of resources the parties or the district court might have to expend in order to afford the defendant a fair trial, and they are certainly not the guardians of the taxpayers' interest in the judicial branch budget. Telling the jurors that they must consider what occurs after the court declares a mistrial is akin to having them consider the sentence that might be imposed after they render a verdict, which our Supreme Court has said "invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." 512 U.S. at 579.

Accordingly, I would declare the consequences-of-mistrial portion of the district court's oral preliminary instruction to be erroneous, albeit not clearly erroneous.

BEIER and BILES, JJ., join in the foregoing concurrence.